Larry CAMPBELL, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 1279S341.

Supreme Court of Indiana.

Sept. 4, 1980.

Harriette Bailey Conn, Public Defender, David P. Freund, Deputy Public Defender, Indianapolis, for appellant.

Theo. L. Sendak, Atty. Gen., Stephen J. Cuthbert, Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

The defendant, Larry Campbell, was charged with attempted murder, Ind.Code § 35–41–5–1 (Burns 1979 Repl.) and Ind. Code § 35–42–1–1(1) (Burns 1979 Repl.), and attempted robbery, Ind.Code § 35–41–5–1 (Burns 1979 Repl.) and Ind.Code § 35–42–5–1 (Burns 1979 Repl.).

His first trial resulted in a deadlocked jury and was declared a mistrial. At a second trial one month later, defendant was found guilty on both counts and sentenced to forty years on each count, the sentences to run concurrently. He now appeals raising the following two issues:

1. The failure of the state to disclose the true nature of one of their witnesses' testimony; and

2. The alleged insufficiency of the evidence.

A summary of the facts from the record most favorable to the state shows that about 10:30 p. m. on June 26, 1978, there was an attempted robbery of the Renwald Ice Cream Warehouse in St. Joseph County, Indiana. The assistant manager, Stanley Baginski, had just finished loading an ice cream truck and was coming out of the warehouse when he was confronted by three black men wearing scarves over the lower part of their faces. One of the men had a sawed–off shotgun and one had a knife. They told Baginski to "Hold it right there," and the man with the knife took him at knifepoint back into the warehouse and demanded the company's money. Baginski said the money wasn't in the warehouse. The robber took his wallet, then made more demands for the company's money. Baginski finally told the robber the money was locked up in a truck outside. At this point, Baginski heard two shots fired and the robber ran out of the door. More shots were fired and Baginski called the police.

Meanwhile, the manager of the warehouse, Gordon Pant, had been confronted by the other two robbers where he was working in the freezer. Pant yelled out the name "Wilbur" when he saw the two robbers because he thought he recognized defendant as being a former employee. Pant was shot in the abdomen by the robber with the shotgun, but he managed to draw his own handgun and fire back. All three robbers attempted to flee but one was wounded by Pant and later died at the hospital. Pant was critically wounded and required surgery, but did recover and was able to testify at the trial. Testimony showed that Pant had called out the name "Wilbur" because two of defendant's brothers, Wilbur and Ed, had worked for him and he thought one of the robbers looked like Wilbur Campbell. The defendant, Larry Campbell, had apparently worked for Pant only one day.

Charles Kaufman, who lived near the warehouse, testified that he heard someone knocking and banging on his door around 11:18 p. m. on the night of the crime. Kaufman grabbed his shotgun, and when he opened his door he saw defendant standing there. Defendant asked to get into the house because two men were chasing him and they had shot his buddy. Kaufman refused to let defendant into the house and had his wife call the police. Kaufman stated he held his shotgun on defendant the entire time. When the police arrived defendant ran out to the car and an officer handcuffed him and put him into the car. The police officer who first arrived at the Kaufman residence, Dennis Jay, testified that defendant ran up to him and said he had just participated in an armed robbery. Jay testified that defendant also told him to "Tell my mom and dad I'm okay." Jay then handcuffed defendant and placed him in the squad car.

The major testimony for the state was given by Alvin Winston, one of the three men who committed the crime. He testified that he, defendant, and Gregory Bowie were driving around in Bowie's car on the night of the crime. Defendant said they could snatch some money from a place where he had worked. Defendant had a sawed–off shotgun at that time. Winston testified that when they got to the ice cream warehouse, he was the one who held the knife on Baginski until he heard the shotgun go off. Then he ran from the warehouse and hid in the park. He said he talked to Larry Campbell a couple of days later and asked what happened at the warehouse when the shotgun went off. Campbell told him that he shot the man in the freezer and that man had then shot Bowie. Winston testified that he was giving his statements voluntarily and that no threats or promises of any kind had been made to him.

Further testimony revealed that Winston had previously given contradictory statements. He had at first given a substantially similar statement to police in November, 1978. Then in February, 1979, he had given a completely contradictory statement to Campbell's attorney. This was at a time when he was being held in the same jail cell

with Campbell for several weeks. His statement at that time was that neither he nor Campbell had been involved in the robbery in any way. Winston then went back to his first statement at the instant trial. He stated that he had been given promises before both the November and the February statements. However, he testified that his statements at the instant trial were the truth and were given freely and voluntarily with no threats or promises made to him.

Defendant testified in his own defense and stated that he was forced into a car by an individual with a shotgun on the night of the crime. He stated that two individuals were in the car and told him he would have to help them pull off a robbery that night or he would be killed. He said that after they drove around for awhile he was able to jump from the car and run some distance through woods and fields to a farmhouse. When he knocked on the door, a man and woman answered the door. The man was carrying a shotgun. Defendant requested that they call the police.

Circumstantial evidence was introduced which supported Winston's testimony. Police found two sets of footprints leading away from the freezer at the warehouse. One set led to where Bowie's body was found and the other led toward a road in the direction of Kaufman's house. One of the prints lifted from this second set of footprints exactly matched the sole of defendant's tennis shoe even to the location of a small cut in the rubber. An expert testified that while it was possible some other tennis shoe of the same brand could have made the print, the wear pattern and location of the small cut would have to also be exactly the same as that on defendant's shoe.

### I.

■ Defendant first alleges that he should be granted a new trial because the state failed to reveal an alleged "deal" given to its key witness, Winston. Indiana has long recognized that in order for the jury to have all the facts and circumstances upon which to judge the credibility of a witness, the state must disclose any promises, grants of immunity or rewards offered in return for his testimony. The state, in fact, is under a continuing duty to disclose any rewards promised to any witness for testifying. *Turczi v. State*, (1979) Ind., 392 N.E.2d 481; *Hoskins v. State*, (1978) 268 Ind. 290, 375 N.E.2d 191; *Biggerstaff v. State*, (1977) 266 Ind. 148, 361 N.E.2d 895.

In the instant case, however, there is no evidence of any deal being offered to Winston prior to his appearance at the trial. There is evidence that Winston accepted a plea bargain agreement two weeks *after* the trial. At that time, Winston agreed to plead guilty to attempted robbery, a class B felony, for the instant crime, rather than face the charge of attempted robbery, a class A felony. He was also allowed to enter a guilty plea to another class B felony and other minor charges against him were dismissed.

Defendant argues that because Winston was represented by an attorney during the time preceding as well as after the trial, he would never have given the self—incriminating evidence that he gave unless his attorney and the state had reached some kind of secret agreement or "deal" prior to the trial. He further contends that the fact that the plea bargain was reached so soon after the trial supports his allegation that some type of deal must have been reached prior to trial. He points out that this Court reversed the conviction in *Newman v. State*, (1975) 263 Ind. 569, 334 N.E.2d 684, because the jury had not been informed of an existing deal even though the attorney who prosecuted the case was not personally aware of any bargain. *Accord, Giglio v. United States*, (1972) 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. However, in these cases there was evidence of the existence of the deal reached prior to trial, and we have no such evidence in the instant case.

■ We are not persuaded by defendant's arguments. While he is able to point to some circumstances which show a possibility of the existence of an agreement prior to trial, there is no actual evidence of an agreement and the witness denied at trial that any promises had been given him.

Furthermore, the record shows that the jury was aware of both Winston's involvement with the instant crime and his prior conflicting statements concerning his involvement. The circumstances surrounding the giving of these statements were brought out during Winston's testimony and a copy of the February statement was made a part of the evidence which the jury considered. We find that there was no denial of due process here since there is no actual evidence of any deal existing prior to trial and there was sufficient evidence for the jury to use in weighing the witness's credibility.

## II.

Defendant further contends that the verdict is not supported by substantial evidence. He argues that the circumstantial evidence merely tended to place him at or near the scene of the crime and that the testimony of the state's witness, Winston, was so unreliable it could not support the verdict. As a court of review, we will neither reweigh the evidence nor judge the credibility of witnesses. *Wofford v. State*, (1979) Ind., 394 N.E.2d 100. Rather, we will look only to that evidence most favorable to the state and all reasonable inferences to be drawn therefrom. If there is substantial evidence of probative value to support the conclusion of the trier of fact, the verdict will not be overturned. *Poindexter v. State*, (1978) 268 Ind. 167, 374 N.E.2d 509. We have already found above that the testimony of the witness, Winston, was presented in good faith by the state and that there were adequate facts presented to enable the jury to properly judge his credibility. The circumstantial evidence tends to support Winston's version of the facts rather than defendant's version. Under these circumstances, the testimony of the witness along with the circumstantial evidence was sufficient to support the verdict.

For all of the foregoing reasons, there was no trial court error and the judgment of the trial court should be affirmed.

Judgment affirmed.

GIVAN, C. J., and DeBRULER, PRENTICE and PIVARNIK, JJ., concur.