Chad L. WRIGHT, Appellant (Defendant),

v.

STATE of Indiana, Appellee (Plaintiff).

No. 18S00–9606–CR–458.

Supreme Court of Indiana.

Dec. 29, 1997.

Rehearing Denied April 30, 1998.

Ronald K. Smith, Muncie, for Appellant (Defendant).

Pamela Carter, Attorney General, Michael K. Ausbrook, Deputy Attorney General, Indianapolis, for Appellee (Plaintiff).

SELBY, Judge.

A jury convicted Chad L. Wright ("defendant") of felony murder,[1] conspiracy to com-

---

1. Ind.Code § 35–42–1–1(2) (1993) (defining murder to include felony murder, that is, killing another human being while committing or attempting to commit robbery or other enumerated offenses). The presumptive penalty for murder at the time of the offense was forty years, with sixty years as the maximum enhanced sentence. Ind.Code § 35–50–2–3 (1993 & Supp.1996). *See also Smith v. State*, 675 N.E.2d 693, 695–97 (Ind.1996) (discussing statutory penalty changes in 1994 and 1995).

mit robbery,[2] and criminal confinement.[3] The court sentenced defendant to sixty (60) years on the murder count, forty-five (45) years on the conspiracy count, and twenty (20) years on the criminal confinement count, with all sentences to run concurrently for a total of sixty (60) years.

On appeal, defendant argues that: (1) the court erroneously allowed the State to amend its charging informations to clarify that it was charging defendant as an accessory on the murder and confinement counts; (2) the court improperly allowed a peremptory strike of a prospective juror who was African-American; (3) the court erred when it admitted statements of an alleged co-conspirator, over defendant's hearsay objections, because the State did not lay a proper foundation showing evidence of a conspiracy; (4) there was insufficient evidence to sustain defendant's convictions; (5) the court erred when it refused to give jury instructions on assisting a criminal and attempted robbery as lesser included offenses of murder; (6) the court improperly gave three jury instructions over defendant's objections; (7) the prosecutor's comments during closing argument constitute misconduct warranting reversal of defendant's convictions; and (8) the court erred when it denied defendant's motion to correct error, which was based on the State's failure to disclose an alleged plea agreement entered into with Scott Turner, a key witness for the State and an alleged co-conspirator.

Defendant's arguments are without merit, and, accordingly, we affirm his convictions.

## FACTS

The facts viewed in the light most favorable to the State and the verdicts below are that, in the early morning hours of September 25, 1994, Larry Newton, Duane Turner, and defendant attempted to rob Christopher Coyle ("Coyle"), a Ball State student, and during the course of the robbery shot and killed him. Newton obtained the gun used in the shooting from Scott Turner ("Turner"; no relation to Duane Turner), a State witness

in this case who had purchased the gun late in the afternoon on September 24, but who was not present during the robbery attempt and shooting. Although defendant did not actually shoot Coyle, he was the driver for the group during the commission of the crimes.

The evening began for defendant and his friends at about ten o'clock, when defendant drove to their friend's house on South Elm Street, and defendant and his friends decided to go out. Larry Newton ("Newton") and Duane Turner ("Duane"), got into defendant's car. Turner and the rest of his friends got into another car and followed defendant to a place referred to as "Graffiti Bridge," north of Route 332 near I–69. There they "hung out," drank, and smoked marijuana for about forty-five minutes. (R. at 543.) Then they all went to a graveyard nearby and continued to drink.

While they were at the graveyard, Newton asked Turner for his gun, and Turner gave it to him. At some point after Newton had the gun, Turner was standing behind a friend's car. Duane was standing on Turner's right, Newton was next to him, and defendant was standing next to Newton on the other side. Three of his friends were sitting on the back trunk of the car facing Turner, Newton, Duane, and defendant.

At that point, according to Turner, Newton said to the group that "he wanted to make some money and felt like robbing somebody." (R. at 547.) He asked Turner and one of the other members of the group if they wanted to go with him and they declined. Newton then asked Duane if he wanted to go with him and he agreed to go. He asked defendant if he would drive them to Ball State, and defendant agreed to take Newton and Duane to Ball State. Newton then said, with the group still assembled around him, that he was "hyped" and felt like "killing someone." (R. at 549.) For a few minutes they remained there, smoking marijuana, and then

---

**2.** Ind.Code §§ 35–41–5–2 (conspiracy) and 35–42–5–1(robbery) (1993). Robbery is defined to include the knowing and intentional taking of property from another "by using or threatening the use of force on any person" or by putting the person in fear, and is a Class A felony if it results in serious bodily injury to any person other than a defendant. The maximum penalty of fifty years for a class A felony is set out at Ind.Code § 35–50–2–4 (1993 & Supp.1996).

**3.** Ind.Code § 35–42–3–3(1) (1993)(criminal confinement). Criminal confinement is a class B felony if committed while armed with a deadly weapon or results in serious bodily injury to another person, and the maximum penalty of twenty years for a class B felony is set out at Ind.Code § 35–50–2–5 (1993 & Supp.1996).

Newton said "we're going to go do this, let's go do this." He then walked towards defendant's car, and Duane and defendant followed him. The three of them then drove off with defendant at the wheel at about one thirty in the morning.

Immediately after leaving the graveyard, Newton and Duane talked about doing some "devious things" and showed defendant the gun. They then drove to the Ball State campus area, and at about two o'clock in the morning of September 25, they saw Coyle walking down the street alone near a dormitory. Coyle was returning from escorting another student back to her dormitory after a party.

When they saw Coyle, they circled around and Newton and Duane jumped out of the car and ran towards Coyle. Defendant drove down the street about a block and a half, made a U-turn, parked the car, and waited for them to return.

Duane and Newton, who had his hand on the gun he was displaying in his belt, returned with Coyle and ordered Coyle into the car. Coyle climbed into the back seat behind defendant, who was still seated behind the wheel, Duane got in the passenger's side of the front seat, and Newton got into the back seat on the passenger's side next to Coyle. Newton then asked Coyle if he had any money, and Coyle said that he did not have any money but that he could get some at his residence. Newton, however, did not want to go to Coyle's residence, as he was afraid that there would be people there.

Defendant then drove into a nearby alley, and Newton and Duane got out of the car and also ordered Coyle to get out of the car. Newton and Duane walked Coyle to the back of defendant's car. Newton pulled out the gun and shot Coyle once, fatally, in the back of the head. Newton then handed the gun to Duane, who fired a shot into Coyle's body, which by then was slumped on the ground. The second shot grazed Coyle's shoulder.

Defendant drove Newton and Duane back to their friend's house where Newton and defendant told Turner about the shooting. Newton asked Turner to get rid of the gun.

Defendant then drove with his girlfriend to his girlfriend's sister's house where he dozed off. Turner broke the gun into pieces and put parts of it in a bag which he threw into the Prairie Creek Reservoir. He threw the grips of the gun out the window of a car while driving on 12th Street.

The police arrested Newton, Duane, and Turner within about three days of the crime, and upon hearing about their arrest in the news, defendant went to the police and gave taped and a videotaped interviews regarding his role. Newton, Duane, and defendant were each separately tried.[4]

The jury considered defendant's statements and his testimony together with the testimony of Turner and the other witnesses and evidence. On December 7, 1995, defendant's jury trial ended in guilty verdicts on all three counts.

On January 4, 1996, after defendant's trial, the State amended its information filed against Scott Turner, and, on January 11, 1996, Turner, who was originally charged with conspiracy to commit robbery, pleaded guilty to assisting a criminal.

## DISCUSSION

### I. *Amendment of Informations*

Defendant argues that the court erred when it permitted the State to amend its informations solely for the purpose of charging accessory liability rather than liability as a principal, that is, to charge defendant with aiding Newton and Duane to kill Coyle while attempting to commit robbery and with aiding to confine Coyle without his consent and while armed with a deadly weapon, rather than to charge him with doing these acts himself. This argument is meritless.

Here, although the trial date was initially set for June 5, 1995 on the informations charging defendant as a principal, defendant twice moved for a continuance due to the timing of the trials of Duane and Newton and other scheduling concerns, and the trial court twice granted the defense's motions to continue the trial date, ultimately setting the case for trial on December 4, 1995. The

---

4. The decision on Duane Turner's appeal of his convictions is reported at *Turner v. State,* 682 N.E.2d 491 (Ind.1997).

court advised the State at the time of the second continuance that any motions to amend the pleadings should be made by October 16, 1995, and the defense did not object to this date. Nevertheless, when the State moved on October 12 to amend the informations to charge accessory liability, defendant requested a hearing on the State's motion. The court set the matter for hearing on October 26. On that date the defense requested that the matter be continued to allow him an opportunity to study the State's proposed amendment which he had just received, and the court granted his request. At the continuation of the hearing on October 30, defendant objected to the amendment on the general ground that it changed the availability of defenses available to him but did not explain specifically how he was prejudiced. The court overruled his objections, and defendant failed to move for a continuance to further evaluate and prepare his case in light of the amendments, although the court reminded him of his right to do so.

■ Had defendant seriously believed that the amendment of the charges prejudiced him in any way, he should have requested a continuance to further evaluate and prepare his case in light of the amendments. Having failed to request a continuance after the court granted the motion to amend, defendant has waived this issue on appeal. *Haymaker v. State*, 667 N.E.2d 1113, 1114 (Ind. 1996).

■ Even if, however, defendant had properly preserved the issue for appeal, his argument would still fail, for defendant has not explained how the State's amendment prejudiced his substantial rights.[5] It is not surprising that he could not do so because, as even defendant appears to concede, under the relevant statutory provision,[6] there is no distinction between the criminal responsibility of a principal or an accomplice, *Marshall v. State*, 621 N.E.2d 308, 313 (Ind.1993), and even without an amendment, the State would be entitled to a jury instruction on accessory liability provided that the evidence supports

such an instruction. *Whittle v. State*, 542 N.E.2d 981, 991 (Ind.1989); *Fisher v. State*, 468 N.E.2d 1365, 1369 (Ind.1984).

II. *Peremptory Strike of Potential Juror*

Defendant, who is white, argues that the trial court erred when it overruled his objection to the State's peremptory strike of Robert Thompson, a prospective juror who is an African–American. We disagree.

■ The exercise of racially discriminatory peremptory challenges is constitutionally impermissible. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Hawkins v. State*, 626 N.E.2d 436, 440 (Ind. 1993). To raise a prima facie equal protection clause claim, a defendant must establish that: (1) the juror is a member of a cognizable racial group; (2) the prosecutor has exercised peremptory challenges to remove that group's members from the jury; and (3) the facts and circumstances of this case raise an inference that the exclusion was based on race. *Batson v. Kentucky*, 476 U.S. at 96, 106 S.Ct. at 1723. Defendant and the excluded juror need not be of the same race, and so, a defendant who is white may properly challenge the peremptory strike of an African–American juror. *Powers v. Ohio*, 499 U.S. 400, 404, 111 S.Ct. 1364, 1367, 113 L.Ed.2d 411 (1991); *Willoughby v. State*, 660 N.E.2d 570, 578 (Ind.1996).

Once a defendant makes the requisite prima facie showing, the burden shifts to the prosecutor to provide a race-neutral explanation for the peremptory strike. *Id.* Then the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson v. Kentucky*, 476 U.S. at 95, 106 S.Ct. at 1722. The trial court's decision on the ultimate question of discriminatory intent represents a finding of fact which is accorded great deference on appeal, because the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. *Hernandez v. New York*, 500 U.S. 352, 364–65, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395

---

**5.** Ind.Code § 35–34–1–5(a)(9) and § 35–34–1–5(c) (1993) (permitting amendments that do not prejudice the substantial rights of defendant). *See also Benner v. State*, 580 N.E.2d 210, 212 (Ind.1991); *Woods v. State*, 547 N.E.2d 772, 783 (Ind.1989).

**6.** Ind.Code § 35–41–2–4 (1993) (providing that a person "who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense").

(1991); *United States v. Hunter*, 86 F.3d 679, 683 (7th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996); *Williams v. State*, 669 N.E.2d 1372, 1379 (Ind.1996). Unless a discriminatory intent is inherent in the prosecutor's explanation, however, the reason offered generally will be deemed race-neutral. *Hernandez v. New York*, 500 U.S. at 360, 111 S.Ct. at 1866; *Willoughby v. State*, 660 N.E.2d at 578.

■ The record does not reveal whether the trial court made a finding of prima facie discrimination sufficient to shift the burden of persuasion. Nevertheless, the prosecutor provided a race-neutral explanation, and the record supports the prosecutor's explanation.

The prospective juror testified during voir dire that he had once given someone who had stolen something a ride. He was uncomfortable because, had the police caught the rider, he would have been implicated in the crime. In light of Mr. Thompson's experience, the prosecutor explained that he did not feel that Mr. Thompson "would be able to set that aside in assessing the facts." (R. at 331.) The prosecutor also emphasized that "race had absolutely nothing to do with" the peremptory challenge. The court found that the State had provided a race-neutral explanation of its challenge, and that the challenge was not in any way racially motivated.

Certainly here there is no discriminatory intent inherent in the prosecutor's proffered explanation, and, in fact, that explanation is logical if not compelling. It was entirely reasonable for the prosecutor to be concerned that Mr. Thompson, at the conclusion of the trial, might identify and sympathize with defendant as a result of the experience he related to the court and counsel. Because the prosecutor's explanation was race-neutral and fully supported by the record, there is no warrant for this Court to disturb the trial court's decision.

### III. *Hearsay Objection*

Defendant argues that the State did not lay the proper foundation required under Indiana Rule of Evidence 801(d)(2)(E) for the admissibility of portions of Scott Turner's testimony which recounted certain statements made by Larry Newton on the night of the murder, and that the court improperly admitted those statements over his hearsay objection, thus depriving him of his right of confrontation, presumably under the Sixth Amendment of the United States Constitution. Specifically, defendant objected to the admission of Newton's statements made to recruit assistants to help him rob and kill somebody while Newton was standing in the graveyard with Duane, defendant, and others. We conclude that the court did not err by admitting Newton's statements.

■ Rule 801(d)(2)(E) provides that a statement is not hearsay if it is offered against a party and is a statement made by a co-conspirator during the course of and in furtherance of a conspiracy. Before the statements of one conspirator are admissible into evidence, the trial court must determine, by a preponderance of the evidence, that the declarant and the defendant were involved in a conspiracy, and that the statement was made during and in furtherance of that conspiracy. *See Willoughby v. State*, 660 N.E.2d at 581; *Siglar v. State*, 541 N.E.2d 944, 949 (Ind.1989); *Lopez v. State*, 527 N.E.2d 1119, 1132 (Ind.1988). The existence of the conspiracy may be shown by direct or circumstantial evidence, and the evidence need not be strong. *Lopez v. State*, 527 N.E.2d at 1132; *Wallace v. State*, 426 N.E.2d 34, 41 (Ind.1981). Moreover, statements that occur "during the course of and in furtherance of" the conspiracy can take many forms, and include statements made to recruit potential co-conspirators. *See United States v. Godinez*, 110 F.3d 448, 454 (7th Cir.1997); *Garlington v. O'Leary*, 879 F.2d 277, 283 (7th Cir.1989).[7] Once the court determines that the above requirements have been satisfied, the statement is admissible under the firmly-established co-conspirator exception to the hearsay rule.

---

**7.** Although the cited cases discuss and interpret Federal Rule of Evidence 801(d)(2)(E), that rule is a mirror image of the Indiana rule at issue, and there are no countervailing Indiana laws or policies that would preclude the application of the holdings of these cases here. Accordingly, it is appropriate for us to consider and rely upon these cases in reaching our decision on the hearsay issue. *Yamobi v. State*, 672 N.E.2d 1344, 1347 & n. 4 (Ind.1996).

■ Here, the court determined that a conspiracy had been established after the State laid a foundation consisting of two statements defendant himself made to the police after his arrest, as well as the testimony of Turner. Although defendant denied that he was guilty of conspiring to rob Coyle, he told the police that he knew Newton had a gun and wanted to do "devious" things, that he drove Newton and Duane to Ball State, that he was present when Newton showed Coyle the gun and asked him for money, that he waited while Newton and Duane shot Coyle, and that he then drove them to a friend's house. (R. at 484.) After defendant's statements were admitted, Turner testified regarding the group activities at the graveyard prior to the shooting on the evening of the murder, including the fact that defendant was standing next to Newton and Duane at the time Newton told the group that he wanted to rob and kill someone.

This is ample evidence from which a court could conclude that there was a conspiracy, and that Newton's statements were made in furtherance of the conspiracy. The court, therefore, did not abuse its discretion when it overruled defendant's hearsay objection and admitted Newton's statements.

## IV. *Sufficiency of the Evidence*

Defendant argues that the evidence is insufficient to support his conviction as an accessory in the murder and criminal confinement of Coyle and also is insufficient to support a conviction for conspiracy to commit robbery. Defendant does not contest that Newton and Duane confined Coyle without his consent and then shot and killed him in the course of an attempted robbery, or that he was present at the time. Rather, he argues that neither his presence at the scene of the crime with Newton and Duane nor his negative acquiescence in the crime, is sufficient to support his convictions. In support of his argument, defendant asserts that he

did not get out of his car during the encounter with Coyle; that he was acting under the direction of Newton and Duane; and that he did not have the handgun in his possession and did not shoot Coyle. Defendant maintains that he was "caught up in a situation over which he had no control." (Appellant's Brief at 13.)

In reviewing a claim that the evidence is insufficient to support a conviction, this Court will look only to the evidence most favorable to the State and all reasonable inferences that support the judgment, and will not weigh conflicting evidence or judge the credibility of witnesses. We will affirm the conviction unless, based on this evidence, we conclude that no reasonable jury could find the defendant guilty beyond a reasonable doubt of each element of the crime charged. *See Mayo v. State*, 681 N.E.2d 689, 691 (Ind.1997); *Vance v. State*, 640 N.E.2d 51, 57 (Ind.1994); *Loyd v. State*, 272 Ind. 404, 407, 398 N.E.2d 1260, 1264 (1980).

■ To prove that defendant was an accessory to the crimes of felony murder and criminal confinement, the State must prove that defendant aided Newton or Duane as they confined Coyle, attempted to rob him, and ultimately killed him during the course of their attempted robbery. *See supra* notes 1–3. While mere presence at the scene or acquiescence in the crime is not sufficient to prove his participation,[8] presence at the scene, together with evidence as to defendant's conduct before, during and after the crimes which tends to show complicity, can support an inference of participation in the crimes. *Harris v. State*, 617 N.E.2d 912, 915 (Ind.1993). Moreover, it is not necessary that the State prove that defendant got out of the car while Newton and Duane shot Coyle,[9] or that he held the gun or shot Coyle.[10] It is also not necessary for the State to prove that he discussed, expressly agreed to,[11] or actually intended to or foresaw shooting Coyle.[12] Stated another way, it

8. *Pace v. State*, 248 Ind. 146, 148–49, 224 N.E.2d 312, 313–14 (Ind.1967).

9. *Tingle v. State*, 632 N.E.2d 345, 354 (Ind.1994); *Ford v. State*, 521 N.E.2d 1309, 1310–11 (Ind. 1988).

10. *Harris v. State*, 617 N.E.2d 912, 913–15 (Ind. 1993); *Harden v. State*, 441 N.E.2d 215, 218–19 (Ind.1982).

11. *Ford v. State*, 521 N.E.2d at 1310–11; *Fox v. State*, 497 N.E.2d 221, 227–28 (Ind.1986).

12. *Eads v. State*, 577 N.E.2d 584, 587 (Ind.1991); *Schiro v. State*, 533 N.E.2d 1201, 1207–08 (Ind.

is not necessary that the evidence show the accomplice personally participated in the commission of each element of the offenses. *Fox v. State,* 497 N.E.2d 221, 227–28 (Ind. 1986). Rather the accessory liability statute imposes a form of vicarious liability. *Id.* Thus, evidence that the accomplice acted in concert with those who physically committed the elements of the crime is sufficient to support a conviction for murder and criminal confinement on the accessory theory. *Id.*

■ To prove defendant guilty of conspiracy to commit robbery, the State must prove only that defendant intended to commit a robbery, that he agreed with Newton and Duane to commit robbery, and that one of them performed an overt act in furtherance of the agreement. Ind.Code § 35–41–5–2 (1993). While mere association with the alleged co-conspirator is, standing alone, insufficient to support a conviction, the State is not required to prove the existence of a formal express agreement. *Vance v. State,* 640 N.E.2d at 57. Rather, the State may prove the agreement either by direct or circumstantial evidence. *Id.* at 58.

■ Here, while defendant did not hold the gun or shoot Coyle, this is not a case where defendant was simply present at the scene with Newton and Duane. As stated above, defendant was with Newton and Duane when Newton said he felt like robbing and killing someone and recruited assistants. · Defendant agreed to join them and to drive them to Ball State, and he was aware that Newton was armed with a gun, if not before leaving the graveyard, then right after getting into his car. He helped them drive around while they searched for a victim, and he waited for Newton and Duane while they apprehended Coyle. He saw Newton display the gun and heard him demand money from Coyle who was trapped in the car with the three men. Defendant waited for Newton and Duane while they both shot Coyle, and then he drove them back to their friend's house.

Defendant maintains that he did not hear Newton say that he wanted to rob and kill someone while at the graveyard; that Newton coerced his participation throughout the commission of the crimes; that, even after

Coyle was in the car and Newton asked him for money while displaying a gun, he was confused about what was happening; and, of course, that he is not guilty. His statements and testimony, however, are riddled with inconsistencies and, on balance, largely support the State's case.

In fact, on cross-examination defendant revealed that he was no innocent. He admitted that when Newton said he wanted to do "devious things," defendant thought he meant either robbing someone or doing some other criminal act, and that, when Newton asked Coyle for money while in the car and Coyle said he didn't have money with him but could get some at his residence, Coyle was trying "to buy his life." (R. at 687.) Defendant also admitted that he could have driven off by himself after Newton, who had a gun, and Duane got out of the car to apprehend Coyle and then again after they got out of the car with Coyle, but he did not do so. At no point did defendant deny that he was with Newton and Duane, that he knew Newton had a gun, that Newton asked Coyle for money while displaying the gun in the car, and that Newton and Duane shot Coyle while defendant waited for them in his car. Defendant presented no other witnesses except his mother who knew nothing about the events of September 25 except that her son reported that their car had been stolen.

Moreover, the testimony of Turner and inferences that flow from his testimony, refute any aspects of defendant's testimony that do not support the State's position. Turner testified that defendant was standing right next to Newton when he stated that he felt like robbing and killing someone, and agreed to drive Newton and Duane to Ball State. He also testified that after the crimes, defendant did not appear scared and did not say anything about being threatened or coerced to participate, but rather seemed "normal." (R. at 553.)

There is ample evidence to support defendant's convictions for murder and criminal confinement, as well as for conspiracy to commit robbery.

1989).

## V. *Lesser Included Offense Instruction*

Defendant contends that the court erred when it declined to give requested jury instructions on assisting a criminal and attempted robbery as lesser included offenses of felony murder. We disagree.

■ To determine whether to instruct the jury on a lesser included offense of the charged crime, a court must employ a three-step test. First, the court must compare the statute defining the crime charged with the statute defining the alleged lesser included offense. The alleged lesser included offense is inherently included in the crime charged if the alleged lesser included offense may be established "by proof of all the same material elements or less than all the material elements." Ind.Code § 35–41–1–16 (1993); *Wright v. State*, 658 N.E.2d 563, 566 (Ind. 1995). If an offense is inherently included in the crime charged, the court must proceed to step three, which involves evaluating the evidence. If not, the court must proceed to step two which involves comparing the statute defining the alleged lesser included offense with the charging instrument in the case. If the charging instrument alleges that the means used to commit the crime charged include all of the elements of the alleged lesser included offense, the alleged lesser included offense is factually included in the crime charged, and the trial court should proceed to analyze the evidence pursuant to step three. *Id.* If the alleged lesser included offense is neither inherently nor factually included in the crime charged, then the trial court should not give a requested instruction on the alleged lesser included offense. *Id.*

If the court has determined that the alleged lesser included offense is either inherently or factually included in the crime charged, the third step requires the court to look at the evidence presented in the case by both parties. If there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense, and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction upon request on the inherently or factually included lesser offense. *Id.* If, however, there is no serious evidentiary dispute about the element distinguishing the two offenses, and therefore no meaningful evidence from which the jury could properly find that the lesser offense was committed while the greater was not, then the trial court should not give the lesser included offense instruction. *Fisher v. State*, 468 N.E.2d at 1367. To give an instruction under these circumstances, where the evidence does not warrant it, would be to improperly encourage the jury to reach a compromise verdict. *Hester v. State*, 262 Ind. 284, 315 N.E.2d 351, 354 (1974).

### A.

With regard to defendant's proposed instruction for assisting a criminal, that crime is properly applicable to one who "with intent to hinder the apprehension or punishment of the other person, harbors, conceals, or otherwise assists" a person who has committed a crime or is a fugitive from justice. Ind.Code § 35–44–3–2 (1993). This statute was intended to apply to a person who did not actively participate in the crime itself, but rather assisted a criminal after the fact. *Smith v. State*, 429 N.E.2d 956, 959 (Ind.1982). *See generally* 1 Charles E. Torcia, Wharton's Criminal Law § 33, at 198 and § 35, at 210 (15th ed.1993). The offense of felony-murder, on the other hand, proscribes homicides which occur while a person commits or attempts to commit certain specified felonies including robbery. Ind.Code § 35–42–1–1(2). *See also Eddy v. State*, 496 N.E.2d 24, 27–28 (Ind.1986).

■ It is apparent from a comparison of the statutes that one may commit or attempt to commit a robbery or other felony and kill someone during the course of that crime without assisting a person in avoiding detection and arrest. It is not surprising, then, that this court has held that assisting a criminal is not an inherently included lesser offense of murder. *See Thacker v. State*, 556 N.E.2d 1315, 1321 (Ind.1990); *Evans v. State*, 489 N.E.2d 942, 947 (Ind.1986); *Reynolds v. State*, 460 N.E.2d 506, 509–10 (Ind. 1984). *See also Lahr v. State*, 640 N.E.2d 756, 763 (Ind.Ct.App.1994); *Horn v. State*, 503 N.E.2d 1235, 1236 (Ind.Ct.App.1987).

Defendant cites this Court's decision in *Smith v. State*, 429 N.E.2d at 959 and also

*Moore v. State,* 445 N.E.2d 576, 578 (Ind.Ct. App.1983) for the proposition that assisting a criminal is a lesser included offense of murder. These cases, properly read, involve situations where the State apparently improperly charged defendant with assisting a criminal when only a murder charge was appropriate. After the jury returned convictions on both counts, the court merged the two counts. To the extent that *Smith* and its progeny may be read in another way—and only to that extent—we overrule and disapprove them. In the future, these cases, and cases relying on them such as *Harris v. State,* 617 N.E.2d at 915–16, may not properly be cited for the proposition that assisting a criminal is an inherently included lesser offense of murder.

■■■ Moreover, with regard to step two of the *Wright* test, the charge in this case does not allege conduct that would have constituted the separate offense of assisting a criminal. Accordingly, the crime of assisting a criminal is neither an inherently nor factually included lesser offense of murder, and the court properly refused to give the requested instruction.

### B.

■■■ With regard to defendant's proposed instruction on attempted robbery as a lesser included offense of felony murder, the court also properly refused to give that instruction. Although robbery or attempted robbery is an inherently included lesser offense of felony murder,[13] under the third step of the *Wright* test, the trial court properly refused to give the requested instruction here because defendant cannot say that there was a serious evidentiary dispute about whether or not Newton and Duane shot Coyle during the attempted robbery, and because the jury could not properly have found that defendant committed the lesser offense of attempted robbery but did not commit felony murder. *Wright,* 658 N.E.2d at 567. *See also Fisher v. State,* 468 N.E.2d at 1367; *Brownlow v. State,* 272 Ind. 678, 400 N.E.2d 1374, 1376 (1980); *Hester v. State,* 315 N.E.2d at 354. Stated another way, if defendant was an accessory to attempted robbery and Coyle was killed during the course of that robbery,

defendant cannot legally be guilty of attempted robbery and at the same time avoid a conviction for felony murder. The trial court, therefore, properly refused the requested instruction.

### VI. *Other Jury Instructions*

Defendant argues that the trial court erred when, over his objections, the court gave the jury Final Instructions Nos. 22, 25, and 31. We disagree.

■■■ In reviewing the propriety of a trial court's decision to give or refuse tendered instructions, this Court considers: (1) whether the instruction correctly states the law; (2) whether there was evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions which are given. *Evans v. State,* 571 N.E.2d 1231, 1236–37 (Ind.1991).

### A.

Defendant objected to Final Instruction No. 22 which was among the instructions on accomplice liability and which provides: "A jury may infer participation in a crime from several factors: presence at the scene, failure to oppose the crime, companionship with the principal and conduct before, during and after the offense which tends to show complicity." (R. 720, 776.) Defendant apparently contends that this instruction did not explain clearly enough that mere presence at the scene or negative acquiescence in the crime, were insufficient to establish that he was an accomplice, and that the instruction would mislead the jury. This instruction was immediately followed by Final Instruction Nos. 23 and 24 which defendant neglects to mention in his brief on appeal. Final Instruction No. 23 provides: "Mere presence at the scene of the crime is not sufficient to allow an inference of participation." Final Instruction No. 24 provides: "You are instructed that negative acquiescence is not enough to constitute a person being guilty of aiding and abetting the commission of a crime." (R. at 777.)

---

**13.** *Zenthofer v. State,* 613 N.E.2d 31, 35 (Ind. 1993); *Eddy v. State,* 496 N.E.2d 24, 29 (Ind. 1986); *Collier v. State,* 470 N.E.2d 1340, 1341–42 (Ind.1984).

This Court previously has approved similar jury instructions. *Id.*; *Zenthofer v. State,* 613 N.E.2d 31, 33–34 (Ind.1993). Final Instruction No. 22, particularly when read together with Final Instructions Nos. 23 and 24, is a correct statement of the law, and the giving of this instruction was warranted by the evidence.

### B.

■■■■■ Defendant next objected to Final Instruction No. 25 which provides:

> The Court instructs you that it is the law in Indiana that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it. If he combines and confederates with others to accomplish an illegal purpose, he is liable criminally for everything done by his confederates which flows incidentally from the execution of the common design as the natural and probable consequences of the common design. This rule of criminal responsibility for the acts of others is subject to the reasonable limitation that the particular act or acts of one member of a party, for which the other associates and confederates are to be held liable, must be shown to have been done for the furtherance or in prosecution of the common object and design for which the persons combined together.

(R. at 720–21, 777.) We conclude, as we have in the past, that this instruction is a correct statement of the law regarding the criminal liability of confederates and fully warranted by the evidence in this case. *See Underhill v. State,* 428 N.E.2d 759, 766 (Ind.1981); *Banks v. State,* 265 Ind. 71, 351 N.E.2d 4, 17–18 (1976).

### C.

■■■ Defendant also objected to Final Instruction No. 31 which provides: "An accomplice witness is one who testifies that he was involved in the commission of a crime with the defendant. An accomplice is competent as a witness for the State or the defendant in the trial of a criminal case. The testimony of an accomplice is to be received and weighed by the jury in the same manner and according to the same rules as the evidence of any other witness." (R. at 721, 779.) Defendant does not argue that the instruction is an incorrect statement of the law regarding the weight to be given accomplice testimony. Rather, defendant simply argues that the instruction was misleading in light of the fact that no one testified that he was an accomplice or that he was involved in the commission of a crime with defendant. Defendant is incorrect.

Although Turner did not expressly admit to being an accomplice or a co-conspirator and although he was not named as an accomplice in the informations, Turner did testify that he was with defendant, Newton, and Duane, prior to and after the attempted robbery and murder, that he gave Newton the gun that killed Coyle, and that he disassembled the gun and discarded the parts after defendant, Newton, and Duane committed the crime. He also testified that he was currently charged with conspiracy to commit robbery in connection with the shooting of Coyle, and, after the trial, he pleaded guilty to assisting a criminal. Whether Turner was guilty of conspiracy to commit robbery or the separate but closely related crime of assisting a criminal depends on how the evidence is viewed and weighed. Either way, however, he clearly was involved in the commission of some crime that involved defendant and defendant's actions on September 25. Under these circumstances, the trial court did not err in giving the accomplice instruction.

### VII. *Alleged Prosecutorial Misconduct in the Closing Argument*

Defendant asserts that several comments made by the prosecutor constitute misconduct and warrant the reversal of his convictions. While we agree that certain remarks by the prosecutor were improper, on the facts of this case the prosecutorial misconduct does not warrant the reversal of defendant's convictions.

■■■■ Generally in evaluating a properly preserved claim of prosecutorial misconduct, we first determine whether the prosecutor engaged in misconduct and then whether under all of the circumstances the prosecutor's misconduct placed the defendant in a position of grave peril to which he should not have been subjected. *Zenthofer*

*v. State,* 613 N.E.2d at 34; *Lopez v. State,* 527 N.E.2d at 1125. Whether or not the prosecutor has placed defendant in a position of grave peril is measured by the probable persuasive effect of any misconduct on the jury's decision, and whether there were repeated instances of misconduct which would evidence a deliberate attempt to improperly prejudice the defendant. *Id.*

 To preserve an issue regarding the propriety of a closing argument for appeal, a defendant must do more than simply make a prompt objection to the argument. Defendant must also request an admonishment, and if further relief is desired, defendant must move for a mistrial. *Zenthofer v. State,* 613 N.E.2d at 34; *Brown v. State,* 572 N.E.2d 496, 498 (Ind.1991); *Dresser v. State,* 454 N.E.2d 406, 407–08 (Ind.1983). If the trial court gives the requested admonishment, generally any error is deemed cured. *Id.* at 408. Failure to request an admonishment or move for a mistrial results in waiver of the issue. *Zenthofer v. State,* 613 N.E.2d at 34. Generally this is so, even if the court has overruled a timely objection. *Dresser v. State,* 454 N.E.2d at 407.

 Here, although defendant objected to the arguments set out below, he only requested an admonishment on one occasion and that request was granted. He did not follow this up with a request for a mistrial. In all other instances, although defendant objected, the court overruled his objections, and he did not press the objection further, request an admonishment, or move for a mistrial. Defendant, therefore, has waived his right to review of the prosecutor's comments. Even if, however, defendant had properly preserved these issues, a reversal based on prosecutorial misconduct is not warranted.

### A.

Defendant's first allegation regarding prosecutorial misconduct is based on argument by counsel that defendant's participation in the crimes was motivated by his desire to become a member of a "gang." In a statement made to the police, they asked defendant about Newton and Duane and whether they had made any comments about "Fly and the gang" the night of the murder. Defendant responded that Newton and Duane were "pretty close," and that after the killing "they were saying they had to prove to each other they had the heart to kill somebody." (R. at 525–28.) Then, at trial, although defendant denied that Newton and Duane were in a gang or that he wanted to be in their gang or group, he admitted that they called themselves "Fly," "a family," and "a family of friends," and that they had "initials" that stand for Fly tatooed on their hands. He also showed familiarity with gang terms and procedures. Specifically, he testified that a "wannabe" was someone who wanted to be in a gang, and that, to get into a gang, you were required to do things for the gang members. (R. at 683–84.)

After eliciting this testimony without objection, the State made the following comments during closing argument:

> There's another one [instruction] in here that will tell you that the State of Indiana does not have to prove motive, and it's correct, but I think you got a glimpse of this motive yesterday. A glimpse in the fact that maybe Chad Wright doesn't have the guts to personally pull the trigger, but he's got the guts to show the other gang members that he'll take them there.

> Counsel for Defendant: I object to the use of the phrase, other gang members, Your Honor. There was no evidence that Mr. Wright is a member of a gang, and I'd ask that that remark be stricken. That is not supported by the evidence.

> The Court: The term, other gang members will go out. The jury will disregard that. Go ahead, Mr. Arnold.

> Counsel for the State: I think you saw what's going on there. You don't start out that way, you start out as a look out, you start out as a driver, you're a wannabe. You want to get in a gang, you want to be with the rest of the guys.

> Counsel for the Defendant: Again, Your Honor, I will object. There was no testimony as to any of that on Mr. Wright's part. None. And I would ask that that remark be stricken.

The Court: The last objection is overruled. Go ahead, Mr. Arnold.

(R. at 733–34.)

██ In light of defendant's statement to the police and his testimony on cross-examination, which was admitted without objection, there was an adequate foundation to support the prosecutor's argument. Although, of course, defendant did not admit that he willingly participated in the crime because he was a "wannabe," his testimony showed a familiarity with gang procedure that, together with all of the other evidence, supports an inference that his participation as a driver was motivated at least in part by a desire to become a member of the Fly gang to which Newton and Duane belonged. The prosecutor's argument was not without foundation and did not constitute prosecutorial misconduct. In fact, we have rejected a similar claim of prosecutorial misconduct where the evidence of "gang" membership was no stronger. *See Dresser v. State,* 454 N.E.2d at 408.

### B.

██ Defendant also argues that the prosecutor improperly commented about defendant's failure to call as a witness his girlfriend whom he saw after the shooting and who, according to the prosecutor, could have testified as to whether defendant was upset after the shooting as he claimed. It is not improper in closing argument to focus on the uncontradicted nature of the State's case. *Isaacs v. State,* 673 N.E.2d 757, 764 (Ind. 1996). It is, however, improper to suggest, as the prosecutor did in this case, that defendant has the burden of proof in a criminal case by inquiring in closing argument why the defendant did not call a witness to testify on his behalf. *Chubb v. State,* 640 N.E.2d 44, 48 (Ind.1994). Nevertheless, here, the court had preliminarily instructed the jury that defendant was presumed innocent until proven guilty beyond a reasonable doubt, and that defendant was not required to present any evidence or prove his innocence. The court's final instructions again reminded the jury that the State has the burden of proving defendant guilty beyond a reasonable doubt. In light of these instructions, the weight of the evidence, and the de minimis nature of this impropriety, the prosecutor's comment

certainly did not place defendant in a position of grave peril. *Zenthofer v. State,* 613 N.E.2d at 34.

### C.

██ Defendant also argues that it was improper for the prosecutor during his rebuttal, and in response to defendant's suggestion that Turner was going to make a deal with the State after the trial and therefore was not credible, to respond as follows: "I guess we're back to trying Scott Turner. Let me tell you something, I'll take care of Scott Turner, and what I decide to do will be the right thing. Leave that in my hands." (R. at 763.) We agree with defendant that this comment was improper in that the prosecutor was suggesting that the jury should simply trust him because he was the prosecutor. We have previously emphasized that a prosecutor is not entitled "to play upon his position as a public servant to obtain unfair advantage in a criminal trial." *Craig v. State,* 267 Ind. 359, 370 N.E.2d 880, 884 (1977). The prosecutor's argument on this point, however, was fleeting, and the trial court in both its preliminary and final instructions advised the jury that statements and comments by counsel are not evidence. In its final instructions the court also emphasized that it is the duty of a juror to decide a case only on the evidence given in court. While it would have been better also to have admonished the jury with respect to the specific statement made by the prosecutor here, defendant did not request such an admonishment. The prosecutorial misconduct here did not place defendant in a position of grave peril.

### VIII. *Denial of Motion to Correct Error Based on Turner's Plea Agreement*

Defendant argues that the court erred when it denied his motion to correct error, which asserted that there was a secret plea agreement between the State and its chief witness, Scott Turner, and that State's failure to disclose this agreement warrants reversal of his convictions. We disagree.

As evidence of this alleged secret agreement defendant points to the fact that, on January 4, shortly after Wright's trial ended

on December 7, the State amended the information charging Turner with conspiracy to commit robbery, a class A felony carrying a maximum of fifty years in prison, *see supra* note 2, to charge only assisting a criminal, Ind.Code § 35–44–3–2, a class C felony with a minimum sentence of two years and a maximum sentence of eight years. Ind.Code § 35–50–2–6 (1993 & Supp.1996). Turner then pleaded guilty and the court sentenced him to four years in prison. Defendant also points out that Turner's trial testimony is not credible because he initially gave a statement to the police that was different than his trial testimony, and that his earlier statement had not implicated defendant. Finally, defendant points out that, while Turner initially testified that he had made no plea agreements in exchange for his testimony, and that, as far as he was aware, he would be tried the following week on conspiracy to commit robbery, the trial court ultimately instructed the jury that Turner would not be going to trial the following week.

Defendant relies on *Newman v. State,* 263 Ind. 569, 334 N.E.2d 684 (Ind.1975) and *Lewis v. State,* 629 N.E.2d 934 (Ind.Ct.App.1994), where the convictions were vacated because the prosecutor did not disclose the fact of its plea agreements with key felon-witnesses who testified for the State. He also urges the Court to reconsider the holdings of some of its other cases which defendant apparently believes approve of the use of "wink-and-nod agreements" between the State and felon-witnesses that circumvent disclosure requirements that are clearly applicable if such agreements are made express. *See Lewis v. State,* 629 N.E.2d at 938 n. 6 (expressing concern that once the prosecutor has established his quid pro quo policy for testimony, express confirmed agreements are unnecessary and tacit agreements will be sufficient inducement for government witnesses to give favorable testimony). We reject defendant's invitation to use this case as a vehicle to rewrite established precedent.

We have previously acknowledged the importance of fully disclosing express plea agreements or understandings between the State and witnesses, even where such agreements or understandings are not reduced to writing and where the prosecutor trying the case apparently was unaware of an agreement or understanding reached between the witness and another prosecutor. *Newman v. State,* 334 N.E.2d at 685, 687 (citing *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)). The prosecutor's obligation to disclose such agreements and understandings is particularly important for, as the United States Supreme Court has observed, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

 Nevertheless, we also have held that this duty arises when there is a confirmed promise of leniency in exchange for testimony, and that preliminary discussions are not matters which are subject to mandatory disclosure. *Lopez v. State,* 527 N.E.2d at 1129; *Aubrey v. State,* 478 N.E.2d 70, 74 (Ind.1985). An express agreement requiring disclosure does not exist if a witness testifies favorably in the hope of leniency, and the State neither confirms nor denies that hope to the witness. *Lopez v. State,* 527 N.E.2d at 1129; *Aubrey v. State,* 478 N.E.2d at 74. Similarly, hopes and expectations of a state witness coupled with evidence that a prosecutor-accomplice/witness deal may have been consummated after the in-court testimony is insufficient to bring a case within the *Newman* rule. *McCord v. State,* 622 N.E.2d 504, 509 (Ind.1993); *Abbott v. State,* 535 N.E.2d 1169, 1172 (Ind.1989); *Stanley v. State,* 479 N.E.2d 1315, 1318 (Ind.1985). *See also Campbell v. State,* 274 Ind. 88, 409 N.E.2d 568, 570 (1980).

 When a defendant believes that the prosecutor has failed to disclose an agreement with a state witness, the burden is on defendant to establish the existence of such an agreement by a preponderance of the evidence. *Stanley v. State,* 479 N.E.2d at 1318–19. The mere allegation of an agreement does not create an agreement and is insufficient to warrant relief. Generally, in the absence of a written agreement, proof of an agreement may be established by affidavit

or other testimony. *See Giglio v. United States,* 405 U.S. at 153, 92 S.Ct. at 765; *McCord v. State,* 622 N.E.2d at 508–09; *Lopez v. State,* 527 N.E.2d at 1128.

■ Once the trial court has ruled on a motion to correct error and request for a new trial based on newly discovered evidence, such as Turner's plea after trial, this Court will not disturb the ruling unless there is an abuse of the trial court's discretion. *See Slaton v. State,* 510 N.E.2d 1343, 1347 ( Ind.1987); *Smith v. State,* 429 N.E.2d at 958; *Bubb v. State,* 434 N.E.2d 120, 123 (Ind.Ct.App.1982).

■ Here, there can be no question that Turner hoped to convince the State after his testimony to drop the conspiracy charges against him, as defense counsel cross-examined him vigorously and effectively on this point. Turner hoped that the State would charge him only with assisting a criminal. There also can be no doubt that the State was seriously considering reducing the charges because of Turner's testimony and his assistance in helping the police find the gun, for, in response to defense counsel's closing argument which highlighted the fact that Turner was looking for a deal and was not credible, the prosecutor responded:

> And is Scott Turner getting a deal? I don't know. There's none on the table, but I'll tell you one thing I feel, he deserves some reward for what he's done in these cases, for what he's done in this case, helping the police find that gun. I feel like he deserves something.

(R. at 729.) These facts together with the subsequent plea agreement and defense counsel's allegations of a secret deal standing alone, however, do not establish that the State had an agreement or an understanding with Turner prior to his testimony.

The only remaining fact defendant raises as supporting an inference of the existence of an agreement is that Turner testified that he was going to trial the week after defendant's trial but that the court subsequently informed the jury that Turner would not be going to trial the following week. Our review of the record reflects that, after Turner testified, the court on its own initiative checked to see if a venire for a jury trial had been requested for the following week and

learned that one had not been requested. The court then held a conference in chambers with the prosecutor, defense counsel, and counsel for Turner. No transcript was made of these proceedings. The court reported on the record, however, that it inquired as to whether, in light of its discovery, any curative action should be taken in the presence of the jury regarding Mr. Turner's testimony. The court then inquired on the record whether the parties had reached a stipulation regarding the issue. The prosecutor and defense counsel agreed that the jury would be instructed as follows:

> On Tuesday Scott Turner testified as far as he knew he would go to trial himself next Monday. However, the Prosecuting Attorney and Scott Turner's attorney have advised the Court that Scott Turner will not be tried next week.

(R. at 723.) The jury was so instructed prior to final arguments.

There is nothing more in the record regarding Turner's testimony about his trial date and the stipulation. Although shortly after trial defendant filed a motion to correct error on the issue of the alleged secret agreement, he did not file affidavits to support that motion. We assume that had defense counsel heard anything during the conference in chambers that supported his theory that Turner had made a deal with the prosecutor before trial, he would have stated this on the record rather than simply entering into the stipulation, but in the unlikely event that he did not fully appreciate the significance of any information relayed during the conference until after the State moved to amend the information and Turner pleaded guilty, defense counsel still could have prepared an affidavit that recited what additional supporting facts he learned during the conference or through his investigatory efforts. The trial court gave him an opportunity to support his motion with affidavits and also specifically inquired as to whether he had any evidence other than the facts recited in his motion, discussed in the proffered Exhibit A—which consisted of the original and amended charges as well as the State's motion to amend the information, the court's ruling, the change of plea order,

judgment of conviction, and the transcript of hearing on Turner's change of plea—and argued orally at the hearing on his motion to correct error. Defense counsel advised the court that he did not intend to file affidavits, and that he had no additional evidence to submit.

On the record before us, defendant has established nothing more than that Turner hoped that his testimony would result in dropping the conspiracy charge, and that the State in fact did reward Turner after the trial by allowing him to plead guilty to assisting a criminal. Under the well-established precedent discussed above, therefore, defendant did not meet his burden of establishing that the prosecutor failed to disclose a secret agreement that was made prior to trial. We cannot say that the trial court's denial of defendant's motion to correct error constitutes an abuse of discretion on the facts of this case.[14]

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.

---

14. Defendant makes a separate argument related to his assertion that the prosecutor failed to disclose a secret agreement made with Turner. He argues that the court erred when it decided not to admit certified court records and denied defendant's motion to correct error solely because he did not submit those records with his motion under cover of an affidavit. He asserts that Exhibit A consisted entirely of certified court records that were admissible without affidavits.

The trial court's order denying defendant's motion to correct error is quite short and somewhat ambiguous. Nevertheless, we need not address here the question of whether Rule 16 or Rule 17 of the Rules of Criminal Procedure require that certified records be served with the motion to correct error and whether they must always be submitted under cover of an affidavit. Although the State below strenuously objected to the admission and consideration of these materials and the court ultimately sustained the technical objection, the trial court nonetheless heard defendant's argument on the merits. Moreover, on appeal, the State stipulated to the facts contained in the certified records at issue below, and those materials are included in the record before this Court. We have considered those materials in our evaluation of the merits of defendant's motion to correct error, which we have concluded was properly denied, even if the trial court may have denied the motion on other grounds.