


FILED

Mar 18 2025, 8:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Ajaylan M. Shabazz,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

March 18, 2025

Court of Appeals Case No.
24A-CR-909

Appeal from the Allen Superior Court

The Honorable David Zent, Judge

Trial Court Cause No.
02D06-2111-MR-20

---

**Opinion by Judge DeBoer**
Judge May concurs.
Judge Tavitas concurs in result with separate opinion.

**DeBoer, J.**

## Case Summary

In May 2021, after being accused of stealing drugs, Tiffany Ferris ("Ferris") was beaten, carried to a bathtub, and drowned in a Fort Wayne motel room. DNA evidence, eyewitness testimony, and Ajaylan Shabazz's ("Shabazz") own admissions established his direct and voluntary participation in the murder. A jury found Shabazz guilty of murder[1] under an accomplice liability theory. Given the overwhelming evidence of Shabazz's guilt and finding no reversible error in the trial court's rulings, we affirm.

## Issues

On appeal, Shabazz presents a number of issues for our review, which we reorder and restate as follows:

(1) Whether the trial court erred in allowing a witness to testify remotely during his trial;

(2) Whether the trial court committed fundamental error by admitting evidence of a robbery committed by Shabazz and his alleged accomplices shortly after the killing;

---

[1] Ind. Code § 35-42-1-1(1).

(3) Whether the trial court abused its discretion by allowing evidence that an alleged accomplice in the murder had died but not that she had died by suicide;

(4) Whether the trial court (a) improperly refused to instruct the jury on the offense of assisting a criminal as a lesser included offense to murder, and (b) abused its discretion by prohibiting Shabazz from arguing in his closing argument that he had only committed the offense of assisting a criminal;

(5) Whether the accomplice liability jury instructions were incorrect and constituted fundamental error; and

(6) Whether the evidence was sufficient to support Shabazz's murder conviction.

## Facts and Procedural History

[3] In May 2021, Shabazz, Ferris, Ariona Darling ("Darling"), and Dustin Blair ("Blair") intermittently used a motel room used for storage in the Fort Wayne Suburban Inn unbeknownst to the management of the motel. The "filthy" and cluttered room was accessed through a window and served the dual purposes of providing the individuals with shelter and a place to use drugs. *Tr. Vol. 1* at 160.

[4] Around 11:30 p.m. on May 9, 2021, Shabazz and Darling walked to a Shell gas station near the Suburban Inn. While Darling was in the convenience store, Shabazz encountered Terry Smith ("Smith") outside, who was a "total

stranger" at the time. *Id.* at 185. Smith asked about Darling's availability, but Shabazz indicated she was not available because she was his fiancée. The conversation then turned to drugs, and Shabazz and Smith discussed trading drugs they each possessed or could secure. Shabazz informed Darling of the plan and the couple got into Smith's pickup truck and Smith drove them back to the Suburban Inn.

[5] Once there, Shabazz, Darling, and Smith entered through the window into the abandoned motel room where Ferris and Blair were occupying the room. At the time, Blair was withdrawing from crystal methamphetamine and Ferris was withdrawing from fentanyl and was "dope sick"—experiencing cramps, chills, shakes, and sweats. *Id.* at 135. Blair had only known Shabazz and Darling for a short time and felt "awkward" about the situation, so he left the motel room. *Id.* at 136. When he left, Ferris was uninjured and sleeping in a chair. He walked to the nearby Shell gas station where his sister-in-law worked, and she allowed him to sleep in her car for a while. Around this time, Shabazz also left the motel room.

[6] While Shabazz was gone, the situation in the room escalated. Darling began "looking for something" and then accused Ferris of stealing her drugs. *Id.* at 188. When Ferris denied stealing her drugs, Darling became angry and began "punch[ing]" and "beating on" Ferris and made Ferris strip so that she could search her for the allegedly stolen drugs. *Id.* at 189. At some point during her tirade, Darling messaged Shabazz who returned to the room to find Darling "[o]ut of control" and "beating on" Ferris. *Id.* at 191. When he returned,

Shabazz picked up Ferris, who was approximately 100 pounds, and slammed her to the floor, striking her head on the corner of a dresser in the process. While Ferris bled, and despite her begging him to stop, Shabazz kicked and stomped on her head. In the midst of these events, Smith, who was "not in a hurry to leave" because he was there for drugs, "wait[ed] around" and occupied himself on his phone. *Id.* at 190.

[7] Shabazz and Darling picked up Ferris, who was still alive, and carried her to the bathtub. Smith briefly left the room to go to the store, but he returned when Shabazz called him about their drug transaction. When Smith returned, he noticed Shabazz and Darling were both "moving fast and acting weird" and they were attempting to clean up. *Id.* at 195. Darling had scissors and was cutting up the carpet and disposing of it in a trash can. Smith went into the bathroom and saw Ferris naked and dead in the bathtub with blood coming from her face and head. Medical evidence later showed that Ferris had died from drowning in a manner consistent with homicide, and there was evidence of blunt force trauma to her head consistent with being punched or kicked.

[8] Shabazz and Darling removed some carpet and other evidence from the room and then, around 5:55 a.m., Smith drove them to a nearby hotel where they disposed of the evidence in dumpsters. Later that same morning, and after the others had departed, Blair walked back to the storage room at the Suburban Inn and discovered Ferris's lifeless body in the bathtub. He then returned to Shell to ask an employee to call law enforcement.

[9] After disposing of the evidence, Shabazz, Darling, and Smith hatched a plan to rob Henry Wright ("Wright"), an acquaintance Shabazz and Darling had met at the motel. Darling contacted Wright and asked if they could stop by his residence at the Hawthorne Suites. After Wright let the three of them inside the residence, they robbed him at gunpoint. Smith wielded the gun and Shabazz, armed with a butcher knife, sat at a table and gave orders as Smith and Darling shoved Wright's belongings into suitcases. During the robbery, Shabazz switched shoes with Wright and left his own bloodstained shoes behind. Testing later revealed Ferris's DNA was present on Shabazz's discarded shoes. After the robbery, Smith drove Shabazz and Darling to Indianapolis, where they were all arrested two days later.

[10] On November 1, 2021, the State charged Shabazz with murder under an accomplice liability theory. While in custody, Shabazz made several incriminating statements to various individuals. Blair was in custody with Shabazz, who told Blair he "killed that bitch" and that Blair needed to "keep [his] mouth shut" or he would "end up like her just as easy." *Id.* at 139. Shabazz also admitted to another inmate, Miquan Jones ("Jones"), that he killed Ferris. Later, Shabazz attempted to influence Jones's testimony by having a guard pass Jones a threatening note—an interaction that was captured on surveillance video. Smith also received a note from Shabazz telling him to "[k]eep it solid" and informing him that Darling had died. *Ex. Vol. 2* at 29. He suggested that Smith "say she did it" and that they could use Darling as a "scapegoat on this case!" *Id.*

By the time Shabazz was tried for murder in February 2024, Jones had been moved to a Department of Corrections ("DOC") facility four hours from Fort Wayne. The State requested Jones be permitted to testify from the DOC because the Sheriff did not have the resources to bring Jones to testify in person. The trial court granted the State's request over Shabazz's objection. The parties also argued to the trial court whether the jury should be allowed to hear that Darling died by committing suicide while in jail. The trial court allowed the parties to tell the jury that she had died, but not how she died.

During the trial, the trial court allowed evidence of Shabazz's involvement with the robbery of Wright's residence subject to a limiting instruction, explaining that it showed the relationship between the accomplices and directly connected Shabazz to the killing through the DNA evidence recovered from his discarded shoes. The trial court declined to give a jury instruction on assisting a criminal as a lesser included offense to murder and did not permit defense counsel to argue in their closing statement that Shabazz should have been charged with assisting a criminal. Following the four-day trial, the jury found Shabazz guilty of murder. The trial court later entered judgment of conviction and sentenced Shabazz to an executed term of sixty-three years in the DOC.

## Discussion and Decision

## 1. Witness Testimony by Video

Shabazz argues that the trial court erred by allowing Jones to testify via Zoom because the State failed to show good cause to conduct the testimonial

proceeding remotely in accordance with interim Administrative Rule 14(C). While the focus of his argument is geared toward Administrative Rule 14(C), Shabazz also mentions, without making much of an argument, that the remote testimony violated his right to confrontation under the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution. Shabazz failed to support his constitutional claims with applicable authorities and cogent reasoning as required by Indiana Appellate Rule 46(A)(8)(a); however, because his constitutional claims are contemplated by Administrative Rule 14(C), we address his arguments anyway.

[14] When the parties discussed preliminary matters with the trial court before trial, the State requested that Jones be permitted to testify via Zoom. Because Jones was in custody, the State explained that it had contacted the DOC about Jones's placement a few months before Shabazz's trial, but the DOC had not yet determined where Jones would be housed when the trial was scheduled to begin. The week before trial, the State filed an order to transport Jones from the DOC but was informed by the Allen County Jail that the county lacked the resources to transport Jones on this timeline because he was housed in a DOC facility located four hours from the county courthouse. Over Shabazz's objection, the trial court permitted Jones to testify remotely.

[15] On the third day of the jury trial, the State called Jones to testify remotely via Zoom and Shabazz objected again. The trial court stated that it would "rather have him here in person but you can see his whole body. You can see his face. You can see he's disappointed right now looking around, but it [is] the best we

can do under the circumstances." *Tr. Vol. 2* at 105. Subsequently, Jones testified that, while they served as inmates together in the Allen County Jail, Shabazz admitted to Jones that he had killed Ferris and later sent Jones a note threatening to kill him if he testified to what Shabazz had told him. The State promised Jones a sentence of home detention in exchange for his truthful testimony; however, Jones ended up committing another offense and was returned to the DOC.

[16] Responding to the COVID-19 pandemic, the Indiana Supreme Court issued an emergency order in May 2020 amending Indiana Administrative Rule 14 "to expand trial courts' ability to conduct remote proceedings through audiovisual communication[.]" *B.N. v. Health and Hospital Corp.*, 199 N.E.3d 360, 362 (Ind. 2022). Effective January 1, 2023, the Supreme Court rescinded this order, finding that the "emergency conditions that necessitated the Emergency Order no longer remain[,]" and issued interim Administrative Rule 14, which is effective today. *Interim Administrative Rule for Remote Proceedings*, Cause No. 22S-MS-1 (Ind. Sept. 30, 2022). Administrative Rule 14(C) states that "[a] court must conduct all testimonial proceedings in person except that a court may conduct the proceedings remotely for all or some of the case participants

for good cause shown or by agreement of the parties. Remote proceedings must comply with constitutional and statutory guarantees."[2] *Id.*

[17] Commentary to the Rule provides that "[p]resenting live testimony in court remains of utmost importance" in Indiana and, therefore, findings of good cause "require particularized and specific factual support." *B.N.*, 199 N.E.3d at 364; *see also G.W. v. Madison State Hospital*, 245 N.E.3d 153, 158 (Ind. Ct. App. 2024). There must be "something specific to the moment, the case, the court, the parties, the subject matter, or other relevant considerations." *B.N.*, 199 N.E.3d at 364-65. "[W]e review a trial court's good-cause determination for an abuse of discretion." Id at 363.

[18] The Sixth Amendment to the United States Constitution instructs that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." "The essential purpose of the Sixth Amendment right to confrontation is to ensure that the defendant has the opportunity to cross-examine the witnesses against him." *Howard v. State*, 853 N.E.2d 461, 465 (Ind. 2006). "[T]he right to adequate and effective cross-examination is fundamental and essential to a fair trial." *Id.* Indiana's confrontation right is mostly "co-extensive" with the federal right of confrontation but "differs from its federal counterpart in that it contemplates a

---

[2] Under the Rule, a 'testimonial proceeding' is "a proceeding in which the judge receives sworn oral testimony;" a 'remote proceeding' is a proceeding that uses "telephone or videoconferencing capabilities to allow case participants to appear virtually;" and 'case participants' include witnesses. Admin. Rule 14(A)(1)-(3).

face-to-face meeting in which the accused and the witness can see and recognize one another." *Brady v. State*, 575 N.E.2d 981, 987 (Ind. 1991); *Hutcherson v. State*, 966 N.E.2d 766, 771 (Ind. Ct. App. 2012), *trans. denied*; *see also Johnson v. State*, 201 N.E.3d 1198 (Ind. Ct. App. 2023), *trans. denied*. Violations of both the federal and Indiana rights of confrontation are subject to review for harmless error. *Coy v. Iowa*, 487 U.S. 1012, 1021 (1988); *Johnson*, 201 N.E.3d at 1206, 1209.

[19] Here, the trial court's finding of good cause to allow Jones to testify via Zoom was supported by case-specific circumstances that made physical transport unfeasible. Jones's uncertain location within the DOC initially prevented transport arrangements, and once Jones was located, resource and time constraints prevented the eight-hour round trip. Additionally, Shabazz's core constitutional right to cross-examination under the Sixth Amendment was preserved as his counsel rigorously cross-examined Jones. *See Howard*, 853 N.E.2d at 465 ("The essential purpose of the Sixth Amendment right of confrontation is to ensure that the defendant has the opportunity to cross-examine the witnesses against him."). The record also reflects that those in the courtroom could see Jones clearly and Shabazz does not contend that Jones could not see him. Importantly, as Shabazz conceded, Jones was not an eyewitness to the murder itself but provided cumulative testimony regarding one of Shabazz's multiple jailhouse admissions. We find that good cause was shown under Administrative Rule 14(C) and that Shabazz failed to establish a

violation of his right to confrontation under our state or federal constitutions such that reversal is required.

## 2. Admission of Evidence Under Rule 404(b)

[20] Shabazz next challenges the trial court's admission of his involvement in the robbery of Wright committed at the Hawthorne Suites shortly after Ferris's murder. He contends that this evidence served only to prove his criminal propensity and that its prejudicial effect substantially outweighed its probative value.

[21] Evidentiary rulings under Indiana Evidence Rule 404(b) are generally reviewed for an abuse of discretion. *Fairbanks v. State*, 119 N.E.3d 564, 567 (Ind. 2019), *cert. denied*, 140 S. Ct. 198 (Oct. 7, 2019). However, because Shabazz failed to object to the admission of this evidence at trial, his argument cannot succeed unless Shabazz can demonstrate that fundamental error occurred. *See Halliburton v. State*, 1 N.E.3d 670, 678 (Ind. 2013). Fundamental error is an "extremely narrow" exception that "applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id.*

[22] Rule 404(b) "serves to safeguard the presumption of innocence in favor of criminal defendants" and "prevents the jury from indulging in the 'forbidden inference' that a criminal defendant's 'prior wrongful conduct suggests present guilt.'" *Fairbanks*, 119 N.E.3d at 568 (quoting *Byers v. State*, 709 N.E.2d 1024,

1026-27 (Ind. 1999)).  Accordingly, Rule 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Rule 404(b)(2).  Rule 404(b) is also subject to Rule 403's balancing test.  Thus, when assessing the admissibility of evidence under Rule 404(b), the trial court must: (1) "determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act;" and (2) determine whether the probative value of the evidence is substantially outweighed by its prejudicial effect.  *Laird v. State*, 103 N.E.3d 1171, 1177 (Ind. Ct. App. 2018), *trans. denied*.

[23]  It is well established that the list of 'other purposes' in Rule 404(b) is "not exhaustive."  *Thompson v. State*, 690 N.E.2d 224, 233 (Ind. 1997).  The State charged Shabazz with murder under an accomplice liability theory and the trial court found that evidence of the robbery which occurred within hours of the murder was "relevant and probative to the relationship of the alleged accomplices."  *Appellant's App. Vol. 2* at 58.  We agree with the trial court.  In his testimony at trial, Shabazz actively disputed that he voluntarily aided, caused or induced Ferris's murder.  He claimed to be a follower who was threatened with force and then directed by Smith to move Ferris into the bathroom.  In contrast, Smith and Wright's testimony regarding the robbery,

which occurred just hours after the murder, depicted it as pre-planned and executed by the cohesive unit with Shabazz as their leader. The trial court did not abuse its discretion in allowing the State to use this evidence to attempt to show the nature of relationship between the alleged accomplices.

[24] Additionally, physical evidence recovered from the robbery scene directly connected Shabazz to Ferris's murder. Specifically, the bloodstained shoes Shabazz discarded at Wright's residence were later determined to contain Ferris's DNA—evidence that was particularly probative given Shabazz's claim that he was not an active participant in the murder.

[25] The trial court also conducted a Rule 403 analysis, finding that the probative value of this evidence was not substantially outweighed by its prejudicial impact. "All evidence that is relevant to a criminal prosecution is inherently prejudicial, and thus the [Rule 403] inquiry boils down to a balance of the probative value of the proffered evidence against the likely *unfair* prejudicial impact of that evidence." *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012), *trans. denied* (emphasis added). To mitigate the prejudicial effect of the details of the robbery, the trial court instructed the jury on the limited purposes for which the robbery evidence could be considered. Given the court's limiting instruction and the highly probative testimony detailing Shabazz's leading role in the robbery committed a few hours after Feris's murder, we cannot say that the trial court erred in admitting this evidence.

## 3. Darling's Suicide

[26] In a preliminary discussion before trial commenced, the State asked the trial court to allow the parties to inform the jury that Darling had died without sharing that she had died by suicide while in jail. The State argued that her death was relevant to keep the jury from "wondering where she is, why she's not here," but that informing the jury she had committed suicide was inappropriate because it would "leave [the jurors] . . . speculating as to why she did that." *Tr. Vol. 1* at 5-6. Defense counsel argued that "just as much speculation" would occur "if we don't tell [the jury] how or why" she died. *Id.* at 6. Ultimately, the trial court found that *how* and *where* Darling died was not relevant to the case and allowed mention of her death but not the manner or location of her death.

[27] Shabazz argues that the trial court's evidentiary ruling was prejudicial to Shabazz and "allow[ed] the State to have 'its cake and eat it too.'"[3] *Appellant's Br.* at 35. Trial courts have "broad discretion in ruling on the admission or exclusion of evidence" and we disturb these rulings only upon a showing of an abuse of discretion. *Palilonis v. State*, 970 N.E.2d 713, 725 (Ind. Ct. App. 2012), *trans. denied*. However, failure to timely object to the erroneous admission of evidence at trial results in waiver of the issue on appeal unless the admission

---

[3] In support of his argument, Shabazz cites only one case: *Stephenson v. State*, 29 N.E.3d 111 (Ind. 2015). *Stephenson* concerned the admissibility of the defendant's suicide *attempt*, which we find inapposite to the issue of an unavailable witness's absence.

constitutes fundamental error. *Stephenson v. State*, 29 N.E.3d 111, 118 (Ind. 2015). Shabazz did not object at trial when the State asked the investigating detective whether and when Darling "pass[ed] away" and he has not asked this Court to review the admission of this evidence for fundamental error. *Tr. Vol. 1* at 243. Accordingly, Shabazz waived this argument on appeal.

[28] Waiver notwithstanding, the trial court did not abuse its discretion by permitting evidence that Darling had died but excluding evidence that she had died by suicide. While we acknowledge there is a dearth of authority on this issue, two cases are particularly informative.

[29] In *Moore v. State*, 440 N.E.2d 1092, 1093 (Ind. 1982), the female rape victim was found dead in her home days before Moore's trial. A note found next to her body indicated she had committed suicide, but her death certificate only indicated she had died from a bullet wound to the chest. *Id.* At trial, the jury was allowed to view the victim's death certificate and they knew the timing of her death, but the trial court did not allow evidence of the suicide to be admitted. *Id.* at 1093-94. Our Supreme Court concluded that the trial court's "refusal to allow the admission of any evidence tending to show the witness' death was a suicide, coupled with the admission of evidence strongly suggesting she was murdered," had deprived Moore of his right to a fair trial and constituted fundamental error. *Id.* at 1094 (noting that jurors were left "free to infer appellant had arranged for, or himself committed the murder of [the victim] to prevent her from testifying against him").

[30]     In *Palilonis*, the trial court ruled that the State could present evidence that a rape victim, B.S., was deceased but could not reveal that she had committed suicide. *Palilonis*, 970 N.E.2d at 721.  On appeal, Palilonis argued that *Moore* mandated reversal of his rape conviction because the jury had been informed that B.S. was unavailable because she was dead.  *Id.* at 725.  However, our Court distinguished *Moore*, calling it a "narrow" holding following a "fact-specific inquiry."  *Id.*  We found that the trial court had "acted in the best interest of both parties" because informing the jury that B.S. had committed suicide would have prejudiced Palilonis, and failing to give the jury any reason for B.S.'s absence would have prejudiced the State.  *Id.* at 726.

[31]     Here, the specific facts of this case show that the trial court made a fair judgment that shielded both Shabazz and the State from inappropriate prejudice.  The trial court heard argument on the issue before determining that *how* Darling died was not relevant and that it did not "affect[] any of the elements of [the] case."  *Tr. Vol. 1* at 7.  Additionally, unlike in *Moore*, the trial court did not allow the State to introduce evidence of Darling's death in a manner that was certain to produce rampant speculation amongst the jurors. Rather, the jurors heard the investigating detective subtly acknowledge that Darling had "pass[ed] away" in June 2021.  *Id.* at 243.  And later, after this fact was established, jurors viewed a note Shabazz had written to Smith, stating that Darling was "dead so we got a scapegoat on this case!"  *Ex. Vol. 2* at 29.  The trial court protected the interests of both parties and did not abuse its discretion

by permitting evidence that Darling had died but excluding evidence that she had died by suicide.

# 4. Assisting a Criminal

## A. Jury Instruction

[32] Shabazz argues that the trial court erred in refusing to instruct the jury on assisting a criminal as a lesser included offense of murder. Relatedly, he argues that the trial court abused its discretion by not letting defense counsel argue to the jury that Shabazz had committed the uncharged crime of assisting a criminal.

[33] When determining whether an instruction on a lesser included offense is appropriate, there is a three-part test the trial court should perform. *See Wright v. State*, 658 N.E.2d 563 (Ind. 1995).

> First, the trial court must compare the statute defining the crime charged with the statute defining the alleged lesser included offense to determine if the alleged lesser included offense is inherently included in the crime charged. Second, if a trial court determines that an alleged lesser included offense is not inherently included in the crime charged under step one, then it must determine if the alleged lesser included offense is factually included in the crime charged. If the alleged lesser included offense is neither inherently nor factually included in the crime charged, the trial court should not give an instruction on the alleged lesser included offense. Third, if a trial court has determined that an alleged lesser included offense is either inherently or factually included in the crime charged, 'it must look at the evidence presented in the case by both parties' to determine if there is a serious evidentiary dispute about the

> element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater.

*Webb v. State*, 963 N.E.2d 1103, 1106 (Ind. 2012) (citing *Wright*, 658 N.E.2d at 563).

[34] Our Indiana Supreme Court has consistently held that assisting a criminal is not inherently included in the offense of murder, and this is readily apparent upon comparing the two statutes. *Hauk v. State*, 729 N.E.2d 994, 999 (Ind. 2000); *Sturgeon v. State*, 719 N.E.2d 1173, 1183 (Ind. 1999); *Reynolds v. State*, 460 N.E.2d 506, 510 (Ind. 1984), *reh'g denied*. Murder is the knowing or intentional killing of another human being. Ind. Code § 35-42-1-1(1). In contrast, assisting a criminal occurs when "[a] person not standing in the relation of parent, child, or spouse to another person who has committed a crime or is a fugitive from justice who, with intent to hinder the apprehension or punishment of the other person, harbors, conceals, or otherwise assists the person[.]" I.C. § 35-44.1-2-5(a). This offense is a Level 5 felony if the person assisted has committed a murder. I.C. § 35-44.1-2-5(a)(2). Clearly, someone may knowingly or intentionally kill another human being without assisting a person in avoiding detention or arrest. *Wright v.* State, 690 N.E.2d 1098, 1108 (Ind. 1997), *reh'g denied*. Furthermore, "the assisting a criminal statute was intended to apply to people who did not actively participate in the crime itself, but who did assist a criminal after he or she committed a crime." *Hauk*, 729 N.E.2d at 999.

[35] "To determine whether an alleged lesser-included offense is factually included in the crime charged, we must compare the charging instrument in the specific case with the statute defining the alleged lesser-included offense." *Id.* "If the charging instrument alleges that the means used to commit the crime charged include all of the elements of the alleged lesser included offense, the alleged lesser included offense is factually included in the crime charged[.]" *Wright*, 690 N.E.2d at 1108.

[36] Here, the charging information alleges that "Shabazz, while acting in concert with Terry Smith Jr., and/or Ariona Darling, did knowingly or intentionally kill another human being, to wit: Tiffany Ferris." *Appellant's App. Vol. 2* at 25. This charge contemplates Shabazz's direct participation in the murder of Ferris and does not allege that the crime charged could be proven by showing that Shabazz merely assisted others after they had killed Ferris. Accordingly, assisting a criminal was not factually included in the crime charged and the trial court properly declined to instruct the jury as such.

## B. Closing Argument

[37] Relatedly, Shabazz argues that the trial court abused its discretion by not allowing him to claim in his closing argument that he may have committed assisting a criminal. "It is well settled that the proper scope of final argument is within the trial court's sound discretion." *Nelson v. State*, 792 N.E.2d 588, 591 (Ind. Ct. App. 2003), *trans. denied*. The trial court does not abuse its discretion "unless its decision is clearly against the logic and effect of the facts and circumstances before it." *Dixey v. State*, 956 N.E.2d 776, 782 (Ind. Ct. App.

2011), *trans. denied*. "In seeking reversal of a conviction, the appellant must not only show that the trial court erred but also that he was prejudiced by the error." *Id.*

[38] In *Dixey*, the State had charged Dixey with theft and the trial court ruled that Dixey's counsel could not mention the uncharged offenses of utility fraud and criminal deception during closing argument. *Id.* at 780. After he was found guilty as charged, Dixey appealed, arguing that the court erred because the jury could have found the other statutes more relevant to the evidence presented. *Id.* at 782. Our Court granted Dixey a new trial, finding prejudice, and reasoned that "the jury would have been aided had Dixey been able to explain that the legislature had enacted other offenses directly related to the use of utility bypass schemes or devices that do not require proof of the same requisite mens rea as theft." *Id.* at 783.

[39] Here, the difference between the offenses of murder under an accomplice liability theory and assisting a criminal is not the level of mens rea required for conviction; rather, the offenses require temporally different conduct. A person is not an accomplice to murder—and therefore equally guilty of murder under the law—if they only sheltered or assisted the killer after the fact. *See Dean v. State*, 222 N.E.3d 976, 988 (Ind. Ct. App. 2023) ("[A]n accomplice is criminally responsible for all acts committed by a confederate which are a probable and natural consequence of their concerted action."), *trans. denied.*

Moreover, counsel has no right to argue a theory unsupported by the evidence. *Taylor v. State*, 457 N.E.2d 594, 599 (Ind. Ct. App. 1983). While testifying at trial, Shabazz admitted that he actively participated in the murder by grabbing Ferris's legs and dragging her to the bathroom with Smith. However, he stated that he did so "[u]nder duress of a gun" Smith had pointed at him while demanding Shabazz "grab her fu***** legs." *Tr. Vol. 2* at 194, 200. He then claimed that Smith was the one who cleaned up the crime scene, that he did not "carry evidence out" of the motel, and that he did not trash any evidence. *Id.* at 201. At the conclusion of evidence, Shabazz asked the trial court's permission to argue in closing that he may have committed the uncharged offense of assisting a criminal. However, Shabazz denied that he assisted the others after the murder and his testimony shows he was not prevented from arguing his true defense theory in closing—that his only participation in the murder was moving Ferris's body, which he allegedly did under duress. This is buttressed by the fact that Shabazz successfully petitioned the trial court to instruct the jury on the affirmative defense of duress.

We find no abuse of discretion in the limitation the trial court placed on Shabazz's closing argument.

## 5. Accomplice Liability Instructions

Shabazz argues that the trial court's instructions on accomplice liability were fundamentally flawed because they failed to define the phrase 'acting in concert' and did not adequately convey that his conduct must have been voluntary. Shabazz concedes that he did not object to these instructions at trial

or tender alternative instructions. Consequently, he must demonstrate fundamental error to prevail. *See Paul v. State*, 189 N.E.3d 1146, 1159-60 (Ind. Ct. App. 2022), *trans. denied*. As we previously stated, "[f]undamental error occurs only when the error 'makes a fair trial impossible or constitutes clearly blatant violations of basic and elementary principles of due process presenting an undeniable and substantial potential for harm.'" *Id.* at 1160 (quoting *Strack v. State*, 186 N.E.3d 99, 103 (Ind. 2022)). There is no due process violation where the information given to the jury, "considered as a whole, does not mislead the jury as to a correct understanding of the law." *Boesch v. State*, 778 N.E.2d 1276, 1279 (Ind. 2002).

[43] The trial court instructed the jury that the State had to prove beyond a reasonable doubt that Shabazz, while acting in concert with Smith and/or Darling, knowingly or intentionally killed Ferris. It also provided accomplice liability instructions as follows:

> Accomplice liability is defined by statute as follows:
>
> A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense, even if the other person:
>
> > (1) Has not been prosecuted for the offense
> >
> > (2) Has not been convicted of the offense; or
> >
> > (3) Has been acquitted of the offense
>
> . . .

Under accomplice liability theory, the evidence need not show that the accomplice personally participated in the commission of each element of a particular offense; rather, an accomplice is criminally responsible for all acts committed by a confederate which are a probable and natural consequence of their concerted action.

Neither mere presence at the scene of the crime nor negative acquiescence, standing alone, is sufficient to permit an inference that one participated in a crime.

In determining whether a defendant aided another in the commission of a crime the jury may consider the following: (1) presence at the scene of the crime; (2) companionship with another engaged in the criminal activity; (3) failure to oppose the commission of the crime; and (4) the course of conduct before, during, and after the occurrence of the crime.

*Appellant's App. Vol. 2* at 170-71.

[44] While the trial court has a duty to define words for the jury that have "technical or legal meaning[s] normally not understood by jurors unversed in the law[,]" it can expect the jury to "rely on its collective common sense and knowledge acquired through everyday experiences." *Yeary v. State*, 186 N.E.3d 662, 680 (Ind. Ct. App. 2022). Here, the jury did not need a special instruction defining 'acting in concert' because the phrase could be commonly understood when read alongside the accomplice liability instruction. Moreover, when taken together, the instructions "contain[ed] the pertinent language regarding accomplice liability to instruct the jury." *Paul*, 189 N.E.3d at 1160 (finding no fundamental error in a nearly identical set of accomplice liability instructions).

[45] Shabazz's argument that the jury was not adequately instructed that the offense required voluntary conduct also fails. In *Small v. State*, 531 N.E.2d 498, 499 (Ind. 1988), the Indiana Supreme Court found that the following accomplice liability instruction was inadequate:

> Indiana law provides that: A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense.. [sic] It is also the law that a Defendant is responsible for the acts of his codefendants as well as his own acts. Any act of one is attributable to them all.

*Id.* The Supreme Court reasoned that this instruction was erroneous because it conveyed that the defendant could be found guilty simply by virtue of his relationship with the person who had inflicted the gunshot wound and without regard to whether they were acting in concert at the time. *Id.*

[46] Here, the accomplice liability instructions do not suggest that Shabazz could be convicted of murder based on the actions of Darling or Smith without regard to whether their actions occurred while Shabazz was acting in concert with them. *See Brooks v. State*, 895 N.E.2d 130, 134 (Ind. Ct. App. 2008) (distinguishing *Small*). Rather, the jury was instructed that "an accomplice is criminally responsible for all acts committed by a confederate *which are a probable and natural consequence of their concerted action.*" *Appellant's App. Vol. 2* at 171 (emphasis added). Furthermore, the murder instruction conveyed that the State was required to prove the killing was knowing or intentional and the instruction defining accomplice liability stated that Shabazz's actions as an accomplice must have been knowing or intentional. The instructions, taken as a whole,

sufficiently conveyed to the jury that Shabazz's conduct must have been voluntary.

[47]    For these reasons, there was no error in the accomplice liability instructions.

## 6. Sufficiency of Evidence

[48]    Finally, Shabazz argues that the State presented insufficient evidence at trial to support his conviction for murder, including that he did not act under duress.[4] He contends that the guilty verdict "was the product of the jury's emotional and visceral reaction to Ferris being slain" and the State's decision to pursue Shabazz over other likely suspects. *Appellant's Br.* at 40.

[49]    Our standard of review for sufficiency of the evidence challenges is well settled. *Teising v. State*, 226 N.E.3d 780, 783 (Ind. 2024). When reviewing a claim that the State failed to present sufficient evidence to rebut a defense, "the same standard applies as to other challenges to the sufficiency of evidence." *Gallagher v. State*, 925 N.E.2d 350, 353 (Ind. 2010). Sufficiency claims "trigger a deferential standard of review in which we 'neither reweigh the evidence nor judge witness credibility, instead reserving those matters to the province of the jury.'" *Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024) (quoting

---

[4] The State argues that Shabazz was never entitled to an instruction on duress because this defense does not apply to an "offense against the person as defined in IC 35-42," which includes murder. I.C. § 35-41-3-8(b)(2). However, prior to the reading of the final instructions, the trial court specifically asked the State whether it agreed with the duress instruction, including the striking of the reference that the defense does not apply to an offense against the person. The State responded "[t]hat's fine with the State." *Tr. Vol. 3* at 223. Regardless of any waiver or the propriety of the duress instruction, we find that sufficient evidence supports Shabazz's conviction.

*Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018), *reh'g denied, cert. denied*, 586 U.S. 1090 (Jan. 7, 2019)). "A conviction is supported by sufficient evidence if 'there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Id.* (quoting *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015)). When conducting this review, "we consider only the evidence that supports the jury's determination, not evidence that might undermine it." *Id.* We will "affirm a defendant's conviction unless 'no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.'" *Teising*, 226 N.E.3d at 783 (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)).

[50] At the outset, we note that Shabazz's sufficiency-of-the-evidence argument is almost entirely a request to reweigh the evidence and the credibility of various witnesses, including Smith[5] and himself, which we will not do. We also note that Shabazz persuaded the trial court to instruct the jury on the defense of duress and to inform the jury that the State was required to prove beyond a reasonable doubt that Shabazz did not commit the charged act under duress.[6]

---

[5] Smith entered into a plea agreement whereby he pled guilty to Level 3 felony aggravated battery, received a sentence of twelve years executed, and agreed to testify truthfully in this cause.

[6] This instruction, which Shabazz does not dispute, defined duress as "a defense that the Defendant was compelled to commit the acts charged by threat of imminent serious bodily injury to himself or another person. Compulsion exists only if the force, threat, or circumstances would render a reasonable person incapable of resisting the pressure." *Appellant's App. Vol. 2* at 172.

There was ample evidence to support Shabazz's conviction for murder—knowingly or intentionally killing Ferris while acting in concert with Darling and/or Smith. *See* I.C. § 35-42-1-1(1). The evidence showed that Shabazz joined Darling in beating Ferris and then picked up the small woman and slammed her to the floor, striking her head on a dresser in the process. He and Darling then carried Ferris to the bathtub where she was found dead due to forcible drowning. Shabazz's shoes bore Ferris's DNA and while he was in jail he admitted to Blair and Jones that he killed Ferris and then threatened to kill them if they told on him. He also told Smith to "keep it solid" and that Darling's death meant they had a "scapegoat on this case!" *Ex. Vol. 2* at 29. On this evidence, a reasonable jury could have found Shabazz guilty of murder.

## Conclusion

For the foregoing reasons, we affirm Shabazz's conviction for murder.

Affirmed.

May, J., concurs.

Tavitas, J., concurs in result with separate opinion.

ATTORNEY FOR APPELLANT

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

**Tavitas, Judge, concurring in result.**

[55] I conclude that, by permitting Jones to testify remotely, the trial court violated Shabazz's right to confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution. I write separately because I also disagree with the majority's finding that "good cause was shown under Administrative Rule 14(C)" to permit Jones to testify remotely via videoconferencing software. *Supra*, p. 11. But because I believe the error is harmless beyond a reasonable doubt, I concur in result in the majority's decision to affirm Shabazz's convictions.

[56] As noted by the majority, by the time Shabazz was tried in February 2024, Jones had been moved to a DOC facility outside Allen County. The State requested that Jones be permitted to testify remotely, to which Shabazz objected. The prosecutor stated, "the jail told us they cannot transport [Jones] here because they sent him to a prison that's 4 hours away. So, they cannot bring him back for [t]rial. [T]hey don't have the resources unfortunately."[7] Tr. Vol. I p. 16. The trial court then stated: "[T]he County doesn't have unlimited resources as in if they can't get him, they can't get him, but I mean so I guess we'll talk to George and have the T.V. rolled in. And have [Jones] testify via video." *Id.* at 17. The prosecutor indicated that the State had filed for a transport order for Jones a week before the trial, but there is no indication that

---

[7] The prosecutor's statements were not evidence. *See Piatek v. Beale*, 999 N.E.2d 68, 69 (Ind. Ct. App. 2013) ("It is axiomatic that the arguments of counsel are not evidence"), *aff'd on reh'g, trans. denied*.

such a transport order was issued. At minimum, the trial court should have issued a transport order before finding that Jones could not, in fact, be transported for trial. Ultimately, Jones was permitted to testify via Zoom videoconferencing software. Jones argues on appeal that this violated his right to confront the witnesses against him as guaranteed by both the Sixth Amendment and Article 1, Section 13. I agree.

## A. The Sixth Amendment

[57] The Sixth Amendment applies to the states via the Fourteenth Amendment. *Church v. State*, 189 N.E.3d 580, 593 (Ind. 2022) (citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965)). The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend VI.

[58] "The [United States] Supreme Court has interpreted this clause as guaranteeing 'the defendant a face-to-face meeting with witnesses appearing before the trier of fact.'" *Johnson v. State*, 201 N.E.3d 1198, 1203-04 (Ind. Ct. App. 2023) (quoting *Coy v. Iowa*, 487 U.S. 1012 (1988)), *clarified on reh'g*, 206 N.E.3d 1195, *trans. denied*. The right to face-to-face confrontation is not absolute, but this "'does not . . . mean that it may easily be dispensed with.'" *Id.* (quoting *Maryland v. Craig*, 497 U.S. 836, 850 (1990)). The "primary object" of the Confrontation Clause was to:

> prevent depositions or *ex parte* affidavits . . . being used against
> the prisoner in lieu of a personal examination and cross-
> examination of the witness in which the accused has an

opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Id*. at 1203-04 (citing *Craig*, 497 U.S. at 845).[8]

[59] Thus, "the right guaranteed by the Confrontation Clause includes not only a 'personal examination' but also 'permits the jury that is to decide the defendant's fate **to observe the demeanor of the witness in making his statement**, thus aiding the jury in assessing his credibility.'" *Id*. at 1204 (quoting *Craig*, 497 U.S. at 845-46) (emphasis added). Although "'physical confrontation may constitutionally be denied where the denial is necessary to further an important public policy and 'the reliability of the testimony is otherwise assured,'" "'**face-to-face confrontation at trial is preferred**.'" *Id*. (emphasis added) (quoting *Craig* 497 U.S. at 847). Accordingly, there must be a "case-specific" finding of necessity before the Sixth Amendment right to face-to-face confrontation can be abridged. *Id*. (citing *Craig*, 497 U.S. at 855).

[60] Here, there was no such case-specific finding regarding the necessity of permitting Jones to testify remotely. And nothing in the record shows that denying Shabazz's constitutional right to confront Jones was necessary to further an "important public policy," or that the reliability of the testimony had

---

[8] The Court in *Craig* was in turn quoting *Mattox v. United States*, 156 U.S. 237, 242-43 (1895).

otherwise been assured. *Craig*, 497 U.S. at 847. Not wishing to send a deputy on an eight-hour round-trip to pick up a witness in a murder trial does not further an important public policy. The failure to secure Jones's physical presence at trial, without the trial court making a case-specific finding of an important public policy reason justifying the decision to allow Jones to testify remotely, violated the Sixth Amendment's Confrontation Clause.

## B. Article 1, Section 13

Article 1, Section 13 of the Indiana Constitution provides: "In all criminal prosecutions, the accused shall have the right . . . to meet the witnesses **face to face** . . . ." (emphasis added). Our Supreme Court has long recognized that this basic trial right is "an ancient one with roots in the common law and that its design has more than a single part." *Brady v. State*, 575 N.E.2d 981, 986-87 (Ind. 1991).

The *Brady* Court explained:

> Indiana's confrontation right contains both the right to cross-examination and **the right to meet the witnesses face to face.** It places a premium upon live testimony of the State's witnesses in the courtroom during trial, as well as upon the ability of the defendant and his counsel to fully and effectively probe and challenge those witnesses during trial before the trier of fact through cross-examination. The defendant's right to meet the witnesses face to face has not been subsumed by the right to cross-examination. That is to say, merely ensuring that a defendant's right to cross-examine the witness is scrupulously honored does not guarantee that the requirements of Indiana's Confrontation Clause are met. **The Indiana Constitution**

**recognizes that there is something unique and important in requiring the face-to-face meeting between the accused and the State's witnesses as they give their trial testimony.** While the right to cross-examination may be the primary interest protected by the confrontation right in Article [1], § 13 of the Indiana Constitution, the defendant's right to meet the witnesses face to face cannot simply be read out of our State's Constitution.

*Id*. at 988 (emphasis added). "Because this right is secured by the Constitution, it cannot be abridged by judicial or legislative action." *Id*. (citing *Graves v. State*, 178 N.E. 233, 233 (Ind. 1931)).

[63] Although the confrontation rights assured by the federal and Indiana constitutions are "to a considerable degree . . . co-extensive," the Confrontation Clause of Article 1, Section 13 "has a special concreteness and is more detailed[.]" *Brady*, 575 N.E.2d at 987. Still, our Supreme Court has recognized that this right "must occasionally give way to considerations of public policy and the necessities of the case." *State v. Owings*, 622 N.E.2d 948, 951 (Ind. 1993) (quoted in *Johnson*, 201 N.E.3d at 1208).

[64] Here, there were no such public policy considerations sufficient to permit Jones to testify remotely. In a trial for a serious criminal offense such as murder, the State's burden of showing a case-specific necessity involving an important public policy, such as would permit a witness to testify remotely, is at its zenith. And, here, the State made no such showing, nor did the trial court make such a

finding. Permitting Jones to testify remotely, therefore, violated Shabazz's right to face-to-face confrontation as guaranteed by Article 1, Section 13.[9]

## C. Administrative Rule 14(C)

The Indiana preference for face-to-face confrontation is also reflected in Indiana Administrative Rule 14(C), which governs remote court proceedings. As amended effective January 1, 2023, this rule provides:

> **Authority in Testimonial Proceedings.** A court must conduct all testimonial proceedings in person except that a court *may* conduct the proceedings remotely for all or some of the case participants *for good cause shown* or by agreement of the parties. Remote proceedings *must comply with constitutional and statutory guarantees*.

Ind. Admin. Rule 14(C) (bold in original, italic emphasis added). Thus, although a trial court must generally conduct all testimonial proceedings in person, it has discretion to allow participants to appear remotely "for good cause shown." *Id.* But as the comment to the rule emphasizes, "Presenting live testimony in court remains of utmost importance." *Id.*, Commentary. And this discretion is tempered by the requirement that remote proceedings comply with constitutional guarantees, which includes the right to confrontation.

---

[9] My research has revealed no Indiana case in which an adult witness has been permitted to testify remotely simply because the State alleged that it could not afford to secure the presence of the witness. Child witnesses and others that fall within scope of the protected person's statute, Indiana Code § 35-37-4-6, which does involve a matter of important public policy, are thus distinguishable. More importantly, the protected person's statute is not at issue in the present case.

In criminal cases, the discretion afforded to trial courts under Administrative Rule 14(C) must comport with a defendant's constitutional rights. Here, Shabazz's right to confrontation, as guaranteed by both the Sixth Amendment and Article 1, Section 13, was not honored. Administrative Rule 14(C) could not authorize remote testimony that does not comport with a defendant's constitutional guarantees.[10]

## D. The Importance of In-Person Testimony

The ability to see a witness on a video screen is a poor substitute for in-person testimony. As noted above, the uniqueness of in-person testimony has been recognized by the United States Supreme Court and the Indiana Supreme Court. Not only is it more difficult to bear false witness when facing the accused in court, the jury (or the judge when acting as the trier of fact) can see the entire demeanor of the witnesses—such as facial expressions, nervous fidgeting, eye movement, and many other such subtle nuances that are much more easily noticed when viewing a witness in person. *See* Daniel M. Bialerk, Note, *Assessing Witness Demeanor in the Age of Covid-19 and Beyond*, 31 Cornell J.L. & Pub. Pol'y 451, 473 (2022) ("[I]n-person court sessions allow factfinders to more easily see nonverbal body gestures, which may facilitate communication in other ways."). This is much more difficult, if not impossible,

---

[10] My remarks are focused solely on the Confrontation Clause of our state and federal constitutions. These clauses are applicable only in criminal cases. Such concerns are absent in civil cases, where trial courts have much more discretion to conduct remote proceedings for good cause shown. In a civil case, such good cause could be, for example, a pro se litigant who has difficulty getting to court due to his or her work schedule or due to transportation issues.

to do on a video screen.  In my opinion, "face to face" means exactly what it says.  Screen-to-screen is not face-to-face.[11]

[67] The mere inconvenience of securing the presence of a witness does not outweigh the defendant's right to confront the witnesses against him face-to-face.  *See* Daniel Tran, Note, *Is Witness Credibility on Virtual Courtroom Procedures Impaired or Enhanced for Adults or Children?*, 32 S. Cal. Interdisc. L.J. 491, 512 (2023) (concluding that virtual courtroom proceedings are likely unconstitutional absent compelling interests because such virtual proceedings "impair witness credibility for adults," and concluding that mere efficiency and convenience are not compelling interests).

## E.  Harmless Error

[68] Violations of the right to confrontation under both Sixth Amendment and Article 1, Section 13 are subject to harmless error analysis under a "harmless beyond a reasonable doubt" standard.  *Johnson v. State*, 206 N.E.3d 1195, 1196 (Ind. Ct. App. 2023) (citing *Torres v. State*, 673 N.E.2d 472, 475 (Ind. 1996)), *opinion on reh'g*.  Here, Jones was not an eyewitness to the offense.  He was incarcerated with Shabazz, and Shabazz admitted to Jones that he killed Ferris.  Shabazz also admitted to Blair that he killed Ferris.  Jones' direct examination fills only three and a half pages of transcript.  Tr. Vol. 2 pp. 106-09.  Upon cross-examination, Jones admitted that he was incarcerated on a probation

---

[11] Indeed, during Jones' remote testimony, the parties had difficulties hearing Jones.  Tr. Vol. II p. 110.

violation and was released on home detention in exchange for testifying against Shabazz. Given the weight of the other evidence against Shabazz, and the cumulative nature of Jones' testimony, I conclude that the error in permitting Jones to testify remotely was harmless beyond a reasonable doubt. I, therefore, concur in the result reached by the majority.